JAIME B. FUSTER Y OTROS, demandantes y apelados, *v.* WALTER BUSÓ Y OTROS Y PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, demandados y apelantes.

Número: O-73-469    Resuelto: 31 de mayo de 1974

*Francisco De Jesús Schuck, Secretario de Justicia, Myriam
Naveira de Rodón, Procuradora General, Peter Ortiz* y
*Américo Serra, Procuradores Generales Auxiliares, Duprey
Tacoronte, Fiscal Auxiliar,* abogados de la Junta Estatal de
Elecciones; *Carlos Gallisá,* abogado del apelante Luis Angel
Torres; *Roberto Busó* y *Angel Pabón Mediavilla,* abogados
del Partido Independentista Puertorriqueño; *Benny Frankie
Cerezo,* por derecho propio; *Gerardo A. Carlos* y *Arturo
Trías,* abogados de Benny Frankie Cerezo; *Jaime Fuster,* por
derecho propio; *María Luisa León Valiente,* por la parte
apelada excepto Benny Frankie Cerezo; *Juan M. García,*
abogado del amicus curiae, Colegio de Abogados de Puerto
Rico.

PER CURIAM: Es controvertible si los demandantes tienen capacidad jurídica (*standing*) para traer este pleito. Son ellos tres ciudadanos y dos personas imaginarias: "Fulano de Tal" y "John Doe." Fulano de Tal es la versión española del John Doe del idioma inglés.

Decimos que es controvertible la capacidad jurídica de los demandantes porque este pleito tiene el propósito nominal de sentar en la Cámara de Representantes de Puerto Rico al señor Roberto Sánchez Vilella pero el señor Sánchez Vilella quien sería la persona realmente interesada no es demandante ni es parte en el litigio. Sin embargo, debido al interés público del asunto y a que están envueltas en él varias disposiciones constitucionales, una disposición de la Ley Electoral y una actuación de la Junta Estatal de Elecciones, hemos decidido entrar en los méritos.

■ Este no es un caso de *gerrymandering*, práctica que implica pequeñez de espíritu en la contienda política; [1] ni de su correctivo la norma de un hombre un voto (*one man one vote*). [2]

En *Baker* v. *Carr* se atacaba un estatuto electoral de Tennessee del año 1901, el cual resultaba injusto en el 1961 debido a los cambios ocurridos en el transcurso de 60 años en el tamaño y en la ubicación de la población de aquel estado. V. 369 U.S. a la pág. 192. Diez años antes de *Baker* v. *Carr* la Constitución de Puerto Rico, en 1952, dispuso que en este país la división en distritos senatoriales y representativos hecha a los fines de la elección de los miembros de la Asamblea Legislativa sería revisada después de cada censo decenal a partir del año 1960 y también dispuso que dichos distritos "estarán compuestos de territorios contiguos y compactos y se organizarán, hasta donde sea posible, sobre la base de población y medios de comunicación."—Constitución de Puerto Rico, Art. III, Sec. 4. Tomo 1, Leyes de Puerto Rico Anotadas, ed. 1965, pág. 244. En el caso de autos no se levanta cuestión alguna sobre la validez de dicha división en distritos senatoriales y representativos.

Tampoco se trata en este caso de manejos electorales motivados por perjuicio racial.

Veamos de qué se trata realmente en este caso. El Partido Popular Democrático se fundó en el año 1938. A las elecciones

---

[1] Se conoce como *gerrymandering* en la literatura política de los Estados Unidos la práctica de diseñar o establecer la demarcación de uno o más distritos electorales con el fin premeditado de favorecer a determinado partido político. Se le dio ese nombre popularmente debido a que fue el Gobernador Elbridge Gerry, de Massachusetts, quien en el 1811 firmó una ley que tenía ese efecto. Algunos autores creen que tal notoriedad es injusta para con Gerry pues él se oponía a dicha práctica. Gerry fue uno de los firmantes de la Declaración de Independencia de los Estados Unidos y luego fue Vicepresidente de aquel país.—Safire, *The New Language of Politics* (1968); Smith y Zurcher, *A Dictionary of American Politics* (1946).

[2] *Baker* v. *Carr*, 369 U.S. 186 (1962); *Gray* v. *Sanders*, 372 U.S. 368 (1963).

del 1940 concurrieron cinco partidos pero de esos solamente tres tenían suficiente fuerza electoral como para tener una probabilidad real de ganar aquella elección.[3] El Partido Popular Democrático obtuvo el 38 por ciento del total de votos emitidos. En las elecciones siguientes, las de 1944, obtuvo el 64 por ciento. En las elecciones de 1948 obtuvo el 61 por ciento y en las de 1952, el 65 por ciento. En dichas elecciones de 1948 el Partido Popular ganó en todos los 78 municipios de la isla.

En cuanto a la composición de la Asamblea Legislativa, el resultado de esas victorias electorales del Partido Popular fue el siguiente. En el cuatrienio de 1944 al 1948, 17 de los 19 senadores pertenecían a dicho partido y dos a la oposición, y en la Cámara de Representantes el partido mayoritario obtuvo 37 escaños y la oposición solamente dos. En el cuatrienio de 1948 al 1952 la situación en el Senado fue idéntica a la antes mencionada y en la Cámara de Representantes el Partido Popular obtuvo 38 de los escaños y la oposición solamente uno.

El alto liderato del Partido Popular, presidido por Don Luis Muñoz Marín, se preocupó ante esa situación de tan escasa representación de los partidos minoritarios en la Asamblea Legislativa del país. Dicho liderato llegó al convencimiento de que era necesario garantizar representación sustancial a los partidos minoritarios en la Asamblea Legislativa aunque sus candidatos no obtuviesen en las elecciones los votos necesarios para salir electos.

Igual pensamiento prevaleció entre los mencionados dirigentes políticos cuando se redactó y se aprobó la ley que autorizó la elección de los delegados a la Convención Constituyente de Puerto Rico, Convención que habría de aprobar

---

[3] Dichos cinco partidos y el número de votos que obtuvieron en las elecciones de 1940 fueron los siguientes: Popular Democrático 214,857; Unión Republicana 134,582; Unificación Puertorriqueña 130,299; Partido Socialista 87,841 y Agrícola Puro 1,272.

la Constitución de Puerto Rico. Por esa razón dicha ley, la Ley Núm. 1 de 3 de julio de 1951, dispuso expresamente como sigue:

"La Convención Constituyente estará integrada por no más de noventa y cinco (95) delegados que serán electos en la siguiente forma: No más de veintitrés (23) delegados electos 'at large,' *de los cuales ningún partido político* podrá postular o elegir más de catorce (14) delegados; y nueve (9) delegados en representación de cada uno de los ocho (8) distritos relacionados en el párrafo anterior, *no pudiendo ningún partido político postular o elegir más de siete* (7) delegados en cada uno de dichos distritos."—Leyes de Puerto Rico (1951), pág. 9. (Bastardillas nuestras.)

En efecto, en la elección especial celebrada en 27 de agosto de 1951 para elegir los delegados a la Convención Constituyente, se eligieron 92 delegados y de éstos 70 fueron electos por el Partido Popular, 15 por el Partido Estadista y 7 por el Partido Socialista. (⁴)

Debido a la preocupación antes mencionada de los líderes del partido de la mayoría en relación con la escasa representación de los partidos de minoría en la Asamblea Legislativa, la mayoría Popular Democrática en la Convención Constituyente propuso, y logró su aceptación, la idea de incluir en la Constitución medidas para garantizar representación minoritaria en la Asamblea Legislativa de Puerto Rico, aunque los candidatos de los partidos minoritarios no obtuviesen los votos para salir electos.

■ Ya hemos mencionado la Sec. 4 del Art. III de la Constitución de Puerto Rico, la cual ordena la revisión cada diez años de la división de la isla en distritos senatoriales

---

(⁴) De dichos 92 delegados 32 eran abogados, 13 agricultores, 9 líderes obreros, 6 maestros, 6 comerciantes, 5 industriales, 4 médicos, 3 periodistas, 2 jueces, un banquero, un dentista, un ingeniero, un farmacéutico y un contable.—Oficina del Comisionado Residente de Puerto Rico en Washington, *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico* (1952) pág. 25.

y representativos, a base del censo decenal y cuya disposición también ordena que dichos distritos estarán compuestos de territorios contiguos y compactos y organizados sobre la base de población y de medios de comunicación. Puede decirse que esa Sec. 4 incorporó la norma de un hombre un voto en nuestra Constitución.

Es en la Sec. 7 de dicho Art. III de la Constitución en donde se encuentran las disposiciones específicas que garantizan la representación de los partidos minoritarios en la Asamblea Legislativa. Se dispone allí, en esencia, que cuando en una elección general resultaren electos *más de dos terceras partes* de los miembros de cualquiera de las Cámaras *por un solo partido,* se aumentará el número de los miembros de la Cámara en cuestión declarando electos candidatos *del partido o partidos de minoría* en número suficiente hasta que el total de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de 17 en la Cámara de Representantes. (5)

---

(5) Otros ejemplos de acción tomada en la Constitución y en las leyes de Puerto Rico bajo el gobierno del Gobernador Muñoz Marín y del Partido Popular, en los cuales se le restaron importantes poderes al Gobernador que anteriormente dicho funcionario tenía bajo la Carta Orgánica de 1917 y bajo leyes anteriores son los siguientes: (1) *Ley Marcial:* Bajo la Carta Orgánica el Gobernador podía decretar la Ley Marcial. Bajo la Constitución de Puerto Rico si el Gobernador decreta la Ley Marcial la Asamblea Legislativa se reunirá inmediatamente por iniciativa propia para ratificar o revocar esa acción del Gobernador. (2) *Hábeas Corpus:* Bajo la Ley Orgánica el Gobernador podía suspender el auto de Hábeas Corpus. Bajo la Constitución sólo la Asamblea Legislativa puede hacerlo, en caso de rebelión, insurrección o invasión. (3) *Poder Judicial:* El Art. V de la Constitución creó una Judicatura independiente. Bajo la Ley Orgánica la administración de los tribunales estaba en manos de la Rama Ejecutiva (Departamento de Justicia). Ahora es función del Juez Presidente de Puerto Rico. La Ley de la Judicatura y la Ley de Retiro de los jueces dan completa independencia a los jueces para el cumplimiento de sus deberes. Para variar el número de jueces del Tribunal Supremo, tiene que ser a propuesta del propio Tribunal. (4) *Elecciones:* Anteriormente cuando en la Junta de Elecciones no había acuerdo se apelaba al Gobernador. Se enmendó la ley para que se apelase al Juez Presidente. Bajo la ley anterior, para las elecciones el

También dispone dicha Sec. 7 que para seleccionar los candidatos adicionales de un partido de minoría, bajo las circunstancias que esta sección supone, se considerarán *en primer término sus candidatos por acumulación* que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término, sus candidatos de distrito que tampoco hubiesen resultado electos.

Dispone además dicha Sec. 7 que la Asamblea Legislativa determinará el número mínimo de votos que deberá depositar un *partido de minoría* para tener derecho a la representación adicional que por dicha Sec. 7 se provee.

Se dispuso en la Constitución que la Asamblea Legislativa fijaría el número mínimo de votos que debe depositar un partido de minoría para participar en esos escaños no conquistados en las urnas sino concedidos por la Constitución, a tenor con la citada Sec. 7 del Art. III porque, como surge claramente del Diario de Sesiones de la Convención Constituyente de Puerto Rico, los constituyentes quisieron desalentar la formación de muchos partidos políticos pequeños y rechazaron, por considerarla indeseable, la representación proporcional. Véase, por ejemplo, el intercambio entre el delegado Sr. Parkhurst y el delegado Sr. Gutiérrez Franqui en el *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. Equity 1961, Tomo 3, págs. 2025–2056.

A tenor con el mandato constitucional de que la Asamblea Legislativa fijase el número mínimo de votos antes mencionado, dicho cuerpo aprobó y el Gobernador firmó la Ley Núm. 18 de 22 de agosto de 1952 (16 L.P.R.A. sec. 276), la cual adicionó a la Ley Electoral vigente entonces la Sec. 89(a). Los últimos dos párrafos de dicha Sec. 89(a) disponen lo siguiente:

---

Gobernador nombraba representantes suyos en los distintos pueblos. Se enmendó la ley para que fuese el Superintendente de Elecciones el que nombrase representantes suyos.

"Ningún *partido de minoría* tendrá derecho a candidatos adicionales ni a los beneficios que provee esta sección, a no ser que en la elección general obtenga a favor de su candidato a Gobernador un número de votos equivalentes a un cinco (5) por ciento o más del número total de votos depositados en dicha elección general a favor de todos los candidatos a Gobernador votados en la misma.

Bajo las disposiciones de esta sección los partidos de minoría nunca tendrán, entre todos ellos, más de 9 senadores ni más de 17 representantes."—Leyes de Puerto Rico (1952), pág. 205. (Bastardillas nuestras.)

La Constitución de Puerto Rico comenzó a regir el 25 de julio de 1952, luego de un proceso cuyo comienzo inmediato fue la presentación en marzo de 1950 en el Congreso de los Estados Unidos, por iniciativa puertorriqueña, de un proyecto de ley que luego se convirtió en la Ley Pública 600, aprobada en 3 de julio de 1950, 64 Stat. 319. Para un resumen de dicho proceso constitucional puede verse el que aparece en 98 D.P.R. págs. 437 a la 440.

En el 1964, luego de haber sido electo Gobernador de Puerto Rico cuatro veces consecutivas, Luis Muñoz Marín rehusó postularse para un quinto término. Explicó que creía que no era bueno para la democracia puertorriqueña que él fuese electo por quinta vez.

Como resultado de las elecciones de 1964, en las cuales venció el Partido Popular Democrático, salió electo Gobernador el señor Sánchez Vilella. En el curso de los próximos dos años Sánchez Vilella rompió con su partido, posteriormente ingresa en el Partido del Pueblo y concurre a las elecciones de noviembre de 1968 como candidato a Gobernador por dicho partido. El Partido del Pueblo había sido inscrito en enero de 1968. En esas elecciones vence el Partido Nuevo Progresista y sale electo Gobernador el señor Luis A. Ferré. Obtuvo el segundo lugar el señor Luis Negrón López, candidato a Gobernador del Partido Popular y el señor Sánchez

Vilella obtuvo el tercer lugar como candidato del Partido del Pueblo.

En las elecciones generales de 1972 vuelve a vencer el Partido Popular Democrático, queda en segundo lugar el Partido Nuevo Progresista, en tercer lugar el Partido Independentista Puertorriqueño y en cuarto lugar el Partido del Pueblo. Para esta elección de 1972 Sánchez Vilella no se postuló para Gobernador, sino para Representante por Acumulación por el Partido del Pueblo.

A tenor con nuestra Constitución, el Poder Legislativo se ejerce en Puerto Rico por una Asamblea Legislativa compuesta por dos Cámaras—el Senado y la Cámara de Representantes. El Senado se compone de 27 senadores y la Cámara de Representantes de 51 representantes, excepto cuando dicha composición resultare aumentada a virtud de lo que dispone la citada Sec. 7 del Art. III de la Constitución.

Para los fines de la elección de los miembros de la Asamblea Legislativa, Puerto Rico está dividido en ocho distritos senatoriales y cuarenta distritos representativos. Cada distrito senatorial elige dos senadores y cada distrito representativo elige un representante. Pero, también por disposición constitucional, se eligen además once Senadores y once Representantes por Acumulación (*at large*). Ningún elector vota por más de un candidato a Senador por Acumulación ni por más de un candidato a Representante por Acumulación. Art. III, Constitución de Puerto Rico.

La elección de once Senadores por Acumulación y de once Representantes por Acumulación da oportunidad a los partidos de minoría a tener representación en la Asamblea Legislativa aun cuando, debido a su poca fuerza electoral, no logran elegir ningún legislador en los respectivos distritos.

Como resultado de las elecciones de 1972 el Partido Popular Democrático eligió 37 Representantes a la Cámara (número que es mayor que las dos terceras partes de los miembros de esa Cámara; Sec. 2, Art. III de la Constitución) y el

Partido Nuevo Progresista eligió 14. Habiendo obtenido el Partido Popular Democrático menos de las dos terceras partes del total de los votos emitidos por todos los partidos para el cargo de Gobernador, se produjo la situación que supone el inciso (a) de la Sec. 7 del Art. III de la Constitución, el cual da lugar a que se aumente el número de Representantes a la Cámara para otorgarle representación adicional a los *partidos de minoría.*

Son también de cardinal importancia para el entendimiento y solución de este litigio las siguientes dos disposiciones, una constitucional y la otra estatutaria: La antes mencionada Sec. 7 del Art. III de la Constitución, que establece en su último párrafo que la Asamblea Legislativa dispondrá el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación adicional que en dicha Sec. 7 se establece.

La segunda disposición es la antes citada Sec. 89 (a) de la Ley Electoral entonces vigente, 16 L.P.R.A. sec. 276, sección que, como hemos señalado, fue incorporada a la Ley Electoral por la Ley Núm. 18 de 22 de agosto de 1952. Dicha disposición dispone que ningún *partido de minoría* tendrá derecho a candidatos adicionales a no ser que en la elección general obtenga a favor de su candidato a Gobernador el cinco por ciento o más del número *total* de votos depositados a favor de todos los candidatos para ese cargo.

También dispone esa sección que en virtud de sus disposiciones los partidos de minoría nunca tendrán, entre todos ellos, más de 9 Senadores ni más de 17 Representantes. La razón de esas cifras es que la Ley quiere evitar el resultado anómalo de que mediante la donación de escaños adicionales las minorías resulten tener más de una tercera parte de los miembros de una o ambas Cámaras Legislativas cuando el partido de la mayoría haya obtenido esas dos terceras partes o más. Esto es así porque hay asuntos que requieren las dos

terceras partes o más de los votos y de lo contrario los escaños adicionales donados podrían frustrar el mandato electoral.

La Junta Estatal de Elecciones, organismo público que administraba la Ley Electoral, ([6]) en cumplimiento de la citada Sec. 7 del Art. III de la Constitución y de la Sec. 89(a) de dicha Ley, adicionó tres escaños en la Cámara de Representantes, correspondiendo dos de ellos al Partido Independentista Puertorriqueño y uno al Partido Nuevo Progresista, ambos partidos de minoría.

A dichos efectos la Junta Estatal de Elecciones determinó .que debían declararse electos, y así se declararon, a los señores David Urbina por el Partido Nuevo Progresista y Carlos Gallisá y Luis Angel Torres por el Partido Independentista Puertorriqueño.

El señor Sánchez Vilella, quien, como hemos señalado antes, se postuló para Representante por Acumulación por el Partido del Pueblo, partido que en esa elección de 1972 obtuvo menos de un tercio del uno por ciento de los votos emitidos, no salió electo a cargo alguno.

En marzo de 1973 los demandantes presentaron una petición de *mandamus* en la cual solicitaban que el Tribunal ordenase a la Junta Estatal de Elecciones a certificar a Roberto Sánchez Vilella como candidato electo al cargo de representante por acumulación. Basan esencialmente los demandantes su posición en que Sánchez Vilella obtuvo 59,855 votos (de un total de 1,308,950 votos emitidos) ([7]) mientras que los señores Urbina, Gallisá y Torres habían obtenido considerablemente menos votos que Sánchez Vilella. Luego de unos trámites procesales que no es necesario relatar aquí

---

([6]) La anterior Ley Electoral ha sido recientemente sustituida por una nueva Ley Electoral llamada Código Electoral de Puerto Rico, Ley Núm. 1 de 13 de febrero de 1974.

([7]) Sánchez Vilella obtuvo más votos que su propio partido, el Partido del Pueblo.

los peticionarios obtuvieron en el Tribunal Superior una sentencia declaratoria favorable a ellos.

Los demandados apelantes, miembros de la Junta Estatal de Elecciones, señalan en apelación seis errores pero no es necesario mencionarlos todos porque entendemos que para disponer de este caso basta con mencionar los errores números 2, 3, 4 y 6 los cuales se cometieron y cuya comisión hace necesario revocar la sentencia apelada.

El señalamiento número 2 es al efecto de que el tribunal de instancia erró al resolver que existe un conflicto irreconciliable entre las Secs. 2 y 7 del Art. II y la Sec. 4 del Art. VI, de una parte, y la Sec. 7 del Art. III, de la otra parte, todos de la Constitución de Puerto Rico.

El señalamiento número 3 es al efecto de que el tribunal de instancia aplicó a este caso en forma errónea la doctrina de "un hombre un voto."

El señalamiento número 4 es al efecto de que el tribunal de instancia erró al resolver que la Junta Estatal de Elecciones debió prescindir de la Sec. 89 (a) de la Ley Electoral.

El señalamiento número 6 es al efecto de que el tribunal de instancia erró al no aplicar en este caso la Sec. 7 del Art. III de la Constitución y la Sec. 89 (a) de la Ley Electoral.

Vamos a referirnos al señalamiento número 2. Se alega en él que el tribunal erró al sostener que varias secciones del Art. II y del Art. VI de la Constitución son incompatibles con la Sec. 7 del Art. III del mismo documento. Las constituciones se hacen previo trabajosos esfuerzos y con cuidadosa redacción. (8) No puede livianamente presumirse que en ella

---

(8) La Convención Constituyente de Puerto Rico que aprobó nuestra Constitución y sus asesores trabajaron desde comienzos de septiembre de 1951 hasta el 6 de febrero de 1952. Véase Gutiérrez Franqui y Wells, *The Commonwealth Constitution;* Carl J. Friedrich, *The World Significance of the New Constitution;* Fernós, *From Colony to Commonwealth;* todos estos trabajos aparecen en *The Annals of the American Academy of Political and Social Science,* Vol. 285 (1953) ; *Notes and Comments on the*

se incurre en contradicciones y mucho menos de naturaleza tan importante como de lo que aquí se trata. Se trata nada menos que del proceso eleccionario, proceso mediante el cual se eligen los gobiernos. Las constituciones no son autodestructivas. *Billings* v. *United States*, 232 U.S. 261, 282 (1914). Excepto que el lenguaje lo haga inevitable, no debe presumirse que una cláusula de la Constitución no tiene sentido alguno o que destruye el propósito de otra cláusula del mismo documento.

Basta con examinar las citadas cláusulas para ver que no existe en las mismas el conflicto irreconciliable que le supuso el tribunal de instancia. La Sec. 2 del Art. II, en síntesis, dispone que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de sus derechos electorales. La Sec. 7 de ese mismo artículo reconoce el derecho del ser humano a la vida, a la libertad y al disfrute de la propiedad. Garantiza el debido proceso de ley y la igual protección de las leyes. Prohíbe la aprobación de leyes que menoscaben las obligaciones contractuales. La Sec. 4 del Art. VI, en lo pertinente, ordena la celebración cada cuatro años de elecciones generales. Dispone que en dichas elecciones se elegirá el Gobernador, los miembros de la Asamblea Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley. Dispone que nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad. Autoriza a la Asamblea Legislativa a legislar sobre todo lo concerniente al proceso electoral y a los partidos políticos. Dispone también que todo funcionario de elección popular será elegido por voto directo y que se declarará electo aquel candidato que obtenga un

---

*Constitution of the Commonwealth of Puerto Rico* (1952) publicado por la Oficina del Comisionado Residente de Puerto Rico en Washington; y *La Nueva Constitución de Puerto Rico*, Informes a la Convención Constituyente, preparados por la Escuela de Administración Pública de la Universidad de Puerto Rico (1954).

número mayor de votos que el obtenido por los demás candidatos para el mismo cargo.

Ya anteriormente hemos reseñado lo pertinente de la Sec. 7 del Art. III, que es la sección que dispone para aumentar el número de Senadores o de Representantes cuando un partido elija más de dos terceras partes de los miembros de dichas Cámaras, con el objeto de garantizarle representación en las Cámaras Legislativas a los partidos minoritarios aunque éstos no logren elegir candidatos en las elecciones.

Como puede verse, no hay nada incompatible entre ninguna de las anteriormente mencionadas cláusulas y artículos de la Constitución. El Art. II contiene nuestra Carta de Derechos, la Sec. 4 del Art. VI contiene disposiciones generales sobre las elecciones y la Sec. 7 del Art. III es el vehículo que utilizaron los constituyentes para hacer realidad su deseo de garantizar representación en la Asamblea Legislativa a los partidos minoritarios. Nótese que esa Sec. 7 opera solamente en el caso extraordinario de que un partido elija más de dos terceras partes de los miembros de una o de las dos Cámaras Legislativas. En otras palabras, dicha Sec. 7 no quita nada a los electores ni a los partidos minoritarios sino que, por el contrario, les da lo que no tendrían en su ausencia, esto es, les concede determinados escaños legislativos a los partidos de minoría cuando éstos, todos juntos, no logran elegir más de una tercera parte de los senadores o de los representantes.

Los otros señalamientos que hemos mencionado los vamos a discutir conjuntamente pues están muy relacionados entre sí. Estos son los señalamientos números 3, 4 y 6. En primer lugar, es necesario tener en mente el dato de que si el Partido del Pueblo hubiese obtenido en la elección de 1972 a favor de su candidato a Gobernador cinco por ciento o más del número total de votos emitidos en dicha elección a favor de todos los candidatos a Gobernador que a dicha elección concurrieron, su partido, y por consiguiente él, hubiesen tenido

derecho a optar en la distribución de escaños adicionales en las Cámaras Legislativas, ya que el partido de la mayoría eligió más de dos terceras partes de los miembros de dichas Cámaras. Pero la realidad es que el partido del señor Sánchez Vilella—el Partido del Pueblo—obtuvo el 0.24 del uno por ciento de los votos. Se recordará que ese mínimo del cinco por ciento de los votos fue dispuesto por ley por la Asamblea Legislativa en obediencia al antes mencionado mandato constitucional expresado en el último párrafo de la Sec. 7 del Art. III de la Constitución. Nótese también que ese párrafo constitucional dispone que dicho número mínimo de votos deberá ser depositado por un *partido de minoría*, no por una persona individual. Esto es así porque la Convención Constituyente rechazó la representación proporcional, asunto que mencionaremos más adelante.

Es cierto que el señor Sánchez Vilella obtuvo 59,855 votos para el cargo de Representante por Acumulación por el Partido del Pueblo en las elecciones de 1972. También es cierto que el señor Sánchez Vilella *no salió electo* pues en dicha elección trece candidatos obtuvieron un número mayor de votos que Sánchez Vilella para el cargo de Representante por Acumulación. De esos trece, como es natural, resultaron electos los once que obtuvieron el mayor número de votos. Estos fueron:

| | |
|---|---|
| (1) Luis E. Ramos Yordán | 110,835 votos |
| (2) Severo E. Colberg | 107,777 " |
| (3) Roberto Rexach Benítez | 102,004 " |
| (4) José R. Jarabo | 101,751 " |
| (5) José G. Izquierdo Stella | 98,882 " |
| (6) Olga Cruz Jiménez de Nigaglioni | 98,732 " |
| (7) Angel Viera Martínez | 94,525 " |
| (8) Hernán Padilla | 93,740 " |
| (9) Luis Ayala del Valle | 89,530 " |
| (10) Antonio Sagardía Sánchez | 89,306 " |
| (11) José Granados Navedo | 87,705 " |

Debido al resultado de la elección, antes mencionado, se produjo la situación que supone el apartado (a) de la Sec. 7 del Art. III de la Constitución, el cual da lugar a que se aumente el número de Representantes a la Cámara para otorgarle representación adicional *a los partidos de minoría.* Nótese que tanto dicha Sec. 7 como la ley que por mandato de la misma se aprobara, Sec. 89(a) de la Ley Electoral, se refieren expresa y específicamente *a partidos de minoría,* por la razón antes dicha.

También dispone la citada Sec. 7 que para seleccionar los candidatos adicionales de un partido de minoría se considerarán *en primer término* sus candidatos por acumulación que no hubiesen resultado electos, en el orden de votos que hubieren obtenido. De manera que la Junta Estatal de Elecciones venía obligada por disposición constitucional a recurrir en primer término a los candidatos por acumulación de los partidos de minoría que habían obtenido cinco por ciento o más del total de votos depositados para todos los candidatos a Gobernador en la elección. Los partidos de minoría que cualificaban en ese momento para participar de esos escaños adicionales eran el Partido Nuevo Progresista y el Partido Independentista Puertorriqueño porque dichos dos partidos obtuvieron más del cinco por ciento de los votos antes mencionados.

■ Erró, pues, el tribunal de instancia al fallar que había un conflicto entre las disposiciones de las Secs. 2 y 7 del Art. II de la Constitución y la Sec. 7 del Art. III. Dichas disposiciones son perfectamente armonizables, y más aún, se complementan entre sí. Garantizan "la expresión de la voluntad del pueblo mediante el sufragio universal"—el gobierno por la mayoría electo—(Sec. 2 Art. II) y a la vez garantizan la existencia efectiva de las minorías, elemento indispensable en un gobierno democrático constitucional como el nuestro (Sec. 7 Art. III).

■ Erró también el tribunal de instancia al fallar que existe un conflicto entre la Sec. 7 del Art. III y la Sec. 4 del Art. VI de la Constitución. Vamos a explicarnos. En el Informe de la Comisión de Disposiciones Transitorias y Asuntos Generales de la Convención Constituyente se dijo lo siguiente en torno a la Sec. 4 del Art. VI:

"Para la elección de un funcionario de elección popular no será necesario mayoría absoluta, sino que se declarará electo aquel candidato para un cargo que, con sujeción a la constitución o a la ley, obtenga de los votos depositados *un número de votos mayor que el obtenido por cualquiera de los demás candidatos para el mismo cargo.* Para declarar electo a un ciudadano para un cargo no será necesario que ese candidato obtenga la mitad más uno de todos los votos depositados a favor de todos los candidatos para ese mismo cargo en una elección. Bastará con que obtenga mayoría simple, bastará con que sea electo a base de pluralidad de votos. Es decir: que se declarará electo el candidato que obtenga un número de votos mayor que cualquier otro de los candidatos para el mismo cargo; o sea, el candidato que obtenga el número de votos que sea mayor comparado con el número de votos obtenido por cada uno de los otros candidatos para el mismo cargo."—*Diario de Sesiones de la Convención Constituyente,* Vol. 4 (1952), pág. 2621. (Bastardillas nuestras.)

Sobre el particular es correcto lo expresado por el entonces Secretario de Justicia de Puerto Rico y hoy Juez Presidente del Tribunal Supremo, Honorable José Trías Monge, en su opinión de 8 de enero de 1953, dirigida al Presidente de la Junta Estatal de Elecciones, en la cual se expresó como sigue:

"Tampoco puede aducirse que la Ley 18 [de 22 de agosto de 1952] está reñida con la sección 4 del Artículo VI de la Constitución del Estado Libre Asociado al efecto de que 'se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo.' Este argumento es en realidad equivalente al argumento, ya examinado, de que la intención de la Convención Constituyente fue regir la elección de candidatos adicionales por el principio de representación proporcional,

*principio considerado y expresamente rechazado por la Convención*. Desde luego, que puede chocar, a primera vista, el hecho de que, como en el presente caso, el requisito de que los partidos de minoría obtengan un mínimo dado de votos para poder participar en la distribución de candidatos adicionales puede operar en forma de permitir en ciertas circunstancias la elección de candidatos adicionales con menos votos que otros. La única forma de evitar esta discrepancia era abstenerse de disponer, como en la versión original de la Proposición Substituta sobre el Poder Legislativo, mínimo alguno de votos como requisito para participar en la distribución de candidatos adicionales. Hacer esto, sin embargo, en la opinión de la Convención Constituyente, *exponía* la democracia puertorriqueña *a los males de la proliferación de partidos* y de la conservación artificial de partidos que no contaban con suficiente fuerza electoral, con el consiguiente *fraccionamiento de la responsabilidad política ante el pueblo*. La Convención Constituyente claramente estimó que era de orden más fundamental evitar lo segundo y la Ley 18 de 22 de agosto de 1952 responde al mandato expreso de nuestra Constitución en dicho sentido.

. En vista de las disposiciones terminantes del último párrafo de la sección 7 del Artículo III, el principio de mayoría de votos depositados no puede operar en tal forma que anule la intención de la Convención Constituyente de requerir un porcentaje mínimo de votos para la elección de candidatos adicionales. El único alcance de la sección 4 del Artículo VI, según se desprende del informe de 22 de enero de 1952 de la Comisión de Disposiciones Transitorias y Asuntos Generales, fue simplemente el de reiterar el principio general de elección por mayoría de los votos depositados en vez del principio de decisión por mayoría de votantes inscritos. No hay evidencia en la historia constitucional de esta sección que sostenga la proposición que su efecto es el de echar a un lado las disposiciones de la propia Constitución sobre la elección de candidatos adicionales." (Bastardillas nuestras.)

El problema de la representación existe desde el momento en que el hombre comenzó a pensar sobre la legitimidad del Gobierno y en su deber de obediencia al gobernante. Antiguamente predominó la idea de que se le debía total obediencia

porque el rey gobernaba en nombre de Dios. Pronto fue evidente que esa teoría dejaba al hombre en situación en extremo precaria y éste comenzó a buscar—y encontró—salidas teóricas de esa encerrona. En la Edad Media cobra preëminencia la noción del constitucionalismo. Aunque, desde luego, el contenido de ese concepto se ha desarrollado considerablemente a través de los siglos, su idea central sigue siendo la misma. Esta es que el gobernante, o el gobierno, no son absolutos, sino que su poder tiene límites, está limitado. (9) Se le opone al rey una ley más alta que la suya (*a higher law*) llamada el derecho natural, el cual unos basan en el derecho divino y otros en la razón humana o en el derecho natural laico.

Como se sabe, el siglo 16 fue un período de incubación de las ideas políticas que más tarde han de desarrollarse en los siglos 17 y 18 y que han de plasmarse en las constituciones modernas. En ese proceso de llevar esas ideas de los panfletos políticos hasta las constituciones, le cortaron la cabeza a un rey en Inglaterra y a otro en Francia, y hubo que pasar por la revolución americana, la francesa y por lo menos por media docena de otras revoluciones en Europa en el siglo 18 y primera mitad del 19.

En dicho siglo 16 se publica el extraordinario libro *Vindiciae Contra Tyrannos* (1579). Supone *Vindiciae* la existencia de dos pactos. Uno en el cual Dios es una parte y el rey y el pueblo constituyen la otra, y otro pacto en el cual las partes son el rey y el pueblo. (10)

En el primer pacto, el rey se obliga con Dios a sostener la fe y en el segundo el rey se obliga con su pueblo a gobernar bien y justamente. En ambos contratos el poder del rey es delegado o conferido; en el primero, por Dios y en el segundo,

---

(9) "[I]f the King is without a bridle, that is, without law, they ought to put a bridle on him."—Bracton, siglo 13. Citado en C. H. McIlwain, *Constitutionalism and the Changing World*, 1939, reimpreso en 1969.

(10) Desde luego, la idea del pacto como base del gobierno es mucho más antigua que eso; recuérdese el Viejo Testamento.

por el pueblo. El poder se confiere para ciertos propósitos públicos y se ejercerá condicionado a que se cumplan dichos propósitos. Por lo tanto, explica *Vindiciae*, Dios y el pueblo son los superiores, el rey es un servidor. En vista del segundo contrato—el celebrado entre el rey y su pueblo—se justifica la resistencia a la tiranía. El autor de *Vindiciae* aparentemente toma del derecho romano el concepto del contrato, el cual se resuelve si una parte no cumple. Si el rey no cumple su parte del contrato—gobernar bien—el contrato termina y no obliga al pueblo. Los reyes son realmente electivos, sostiene *Vindiciae*, aunque por costumbre se ha seguido la tradición hereditaria. Pero el derecho del pueblo a escoger su rey no prescribe a pesar de la larga tradición hereditaria. Cuando el poder no se ejerce justa y responsablemente el gobernante se ha convertido en tirano y se justifica la resistencia, admite el autor de *Vindiciae*.

El autor distingue entre dos situaciones. Una es cuando el tirano es un usurpador sin derecho a gobernar. En esa situación está permitida su eliminación, aun por un ciudadano privado. La segunda situación supone que el gobernante legítimo se torna en tirano. Entonces, sostiene el autor, solamente los magistrados, cuya posición los hace los guardianes de la comunidad, pueden resistir al rey. A la luz de la moderna teoría constitucional estadounidense y puertorriqueña, la cual permite la declaración por el Poder Judicial de que determinados actos del Poder Ejecutivo pueden ser nulos, es realmente extraordinaria esa aseveración en *Vindiciae*. Modernamente el término ha variado de guardianes de la comunidad a "guardianes de la constitución".

Como se sabe, la teoría del contrato reaparece en forma distinta en los filósofos de los siglos 17 y 18.—Locke, Rousseau y otros.

En los estados contemporáneos, debido a su gran extensión física y a su mucha población, se hace inevitable que la democracia se ejerza indirectamente a través de represen-

tantes. Ya no es posible gobernar mediante el ágora de la Grecia clásica o el *town meeting* de la Nueva Inglaterra del siglo 17. La democracia moderna funciona mediante los partidos políticos. Estos presentan al electorado una síntesis de ideas y programas de gobierno—lo que se llama la plataforma —y también un grupo de hombres que ofrece gobernar en consonancia con esas ideas y programas. Generalmente el electorado tiene ante sí dos o tres alternativas, y al votar endosa la de su preferencia. Como es imposible que varios programas, contradictorios entre sí, sean realizados a la vez, universalmente se acepta que gobernará la mayoría. La minoría fiscaliza para mantener al gobierno dentro de la moral, la ley y la Constitución y espera su turno o su oportunidad de convertirse en mayoría mediante la persuasión del electorado. Ese sistema coloca la responsabilidad política en un partido— el partido del gobierno—y en un grupo de hombres—el que preside el gobierno y sus colaboradores más destacados.

En el presente litigio los demandantes han revivido en cierta forma el gran debate que en el siglo 19 sostuvieron en Inglaterra John Stuart Mill y Walter Bagehot. Ambos eran economistas, teóricos políticos, liberales y correligionarios, pero sobre la cuestión de cómo debía organizarse la representación legislativa estaban en desacuerdo. Mill defendió la representación proporcional en forma elocuente. Creía que ningún elector debía ser representado por alguien a quién él no había elegido; que la representación proporcional permitía elevar hombres de gran capacidad al Parlamento, evitando así lo que llamó la "mediocridad colectiva"; y que ese era el sistema que permitía a la *elite* educada del país llegar al Parlamento.

Pero desgraciadamente Mill se olvidó del propósito fundamental del Parlamento, el cual es, en Inglaterra sostener al Primer Ministro y a su gabinete en el poder y *gobernar* a través de ellos. Aunque nosotros no tenemos el sistema parlamentario, sino el de tipo presidencial, sin embargo, la Asam-

blea Legislativa participa en la función de gobernar pues tiene la importante facultad de aprobar o no la legislación y el poder de aprobar o no el presupuesto del gobierno. Aunque es muy deseable que al Poder Legislativo concurran mentes brillantes, su propósito no es el de un club de debates.

Nuestro sistema, como hemos visto, permite y garantiza la existencia de las minorías y su función de fiscalizar y criticar al gobierno. Bagehot señaló que el sistema de representación proporcional *al fraccionar en exceso* al Parlamento en partidos, facciones y grupos, prácticamente lo incapacita para gobernar. Señaló Bagehot que los defectos del plan que proponía Mill sobrepasaban en mucho sus virtudes. ([11])

En *La Nueva Constitución de Puerto Rico*, un valioso tomo que contiene los Informes a la Convención Constituyente de Puerto Rico, preparado por la Escuela de Administración Pública de la Facultad de Ciencias Sociales de la Universidad de Puerto Rico, publicado en 1954, contiene unos comentarios sobre este tema de la representación proporcional que tal parece que fueron escritos para la situación que dio motivo al pleito de autos. En lo pertinente, al discutir las bases de la representación se dice allí lo que sigue:

"El primer argumento en contra de la representación proporcional consiste en que falsea los principios de la representación política que son base del Estado moderno. La teoría democrática hace, tanto al parlamento como a cada uno de sus miembros en particular, representantes del pueblo, con una representación de carácter político. Lo representado ahí es una totalidad indivisible, a diferencia de la representación de los antiguos estamentos medievales que estaba concebida a la manera del derecho privado, y en la cual cada representante o 'procurador', hablaba en nombre de sus comitentes, quienes podían darle instrucciones concretas y retirarle la representación en todo momento. . . .

---

([11]) J. S. Mill, *Representative Government*, capítulo 7 (1860); W. Bagehot, *English Constitution*, 2da ed. (1873), cap. 5; Hermens, *Europe Between Democracy and Anarchy* (1951); C. J. Friedrich, *Constitutional Government and Democracy*, 4ta. ed. (1968), cap. 15.

Este falseamiento del principio representativo va acompañado de otras ideas políticas inadmisibles: la de que, dentro del cuerpo político, puede haber divisiones irreductibles, y la de que éstas deben tener su reflejo exacto en el cuerpo legislativo. Por efecto de esta concepción errónea, el sistema de representación proporcional contribuye a *enconar los conflictos internos, a perpetuar las disensiones de opinión* y a fomentar lealtades partidarias hasta un extremo dañino para la unidad sustancial del cuerpo político, *transformando sus diferencias transitorias en divisiones permanentes,* . . . .

La representación proporcional, en efecto, contribuye a atomizar la representación política, *estimulando la proliferación de los pequeños grupos en detrimento de los grandes partidos, únicos capaces de llevar a la práctica un programa de gobierno."* (Bastardillas nuestras.) [Págs. 259–261]

■ Como hemos indicado, en las elecciones de 1972 el Partido del Pueblo, partido por el cual estaba postulado Sánchez Vilella para Representante por Acumulación, *no cualificó como partido de minoría.* Su candidato a Gobernador obtuvo un 30.8 del uno por ciento del total de votos emitidos para el cargo de Gobernador. La Sec. 89 (a) antes citada disponía que para tener derecho a candidatos adicionales, a tenor con la Sec. 7 del Art. III de la Constitución, un partido de minoría debía obtener cinco por ciento o más del número total de votos depositados a favor de todos los candidatos a Gobernador. Como dijimos antes, la Junta Estatal de Elecciones certificó once Representantes por Acumulación y además dos representantes adicionales del Partido Independentista y uno del Partido Nuevo Progresista. Estos últimos dos partidos cualificaron como partidos de minoría por haber obtenido más del cinco por ciento de los votos depositados para el cargo de Gobernador y, en obediencia a la ley, la Junta Estatal de Elecciones así lo determinó.

El tribunal de instancia en ningún momento determinó que la Sec. 89 (a) de la Ley Electoral, 16 L.P.R.A. sec. 276, fuese nula o inconstitucional. Sin embargo, concluyó que la Junta Estatal de Elecciones debió "prescindir" de esa dispo-

sición de ley. Es asombroso el hecho de que un juez, quién al ejercer su ministerio encarna la ley, instruya a un organismo público a prescindir de una disposición estatutaria perfectamente válida y en vigor.

A la luz de los hechos antes relatados y del derecho puertorriqueño aplicable resulta inescapable concluir que el tribunal de instancia cometió también los errores 3, 4 y 6. Habiéndose cometido esos errores y también el número 2 y bastando ello para hacer necesaria la revocación de la sentencia apelada, no creemos necesario discutir los errores número uno y número cinco.

Los demandantes hacen en sus alegatos extensas incursiones en la jurisprudencia (*case law*) de los Estados Unidos. No tenemos querella alguna con eso pero encontramos que ese derecho, excelente como lo es, no hace necesario que modifiquemos nuestro fallo según aquí expresado.

*Se revocará la sentencia apelada.*

El Señor Juez Presidente y el Juez Asociado Señor Dávila, no intervinieron. Los Jueces Asociados Señores Torres Rigual y Martín concurren en el resultado. El Juez Asociado Señor Martín emitirá una opinión concurrente. El Juez Asociado Señor Díaz Cruz además de votar a favor de la opinión del Tribunal emitió también un voto concurrente.

—O—

Opinión concurrente del Juez Asociado Señor Martín.
San Juan, Puerto Rico, a 31 de mayo de 1974

Concurro con el resultado de la opinión del Tribunal por entender que al no lograr el Partido del Pueblo obtener cinco por ciento o más del mínimo de votos emitidos para todos los candidatos a Gobernador perdió el Sr. Sánchez Vilella el derecho de representación que le otorga a los partidos de minoría la disposición contenida en la Sec. 7 del Art. III de nuestra Constitución, conforme la misma ha sido implemen-

tada por la Sec. 89 (a) de la Ley Electoral (16 L.P.R.A. sec. 276).

La representación que provee la Constitución para los partidos políticos minoritarios constituye uno de los adelantos más notables en el proceso electoral puertorriqueño. El alcance de esa disposición, a mi modo de ver, contribuye a dar cierta estabilidad al régimen político, ya que un partido político que domine totalmente las cámaras legislativas, en un momento dado, sin que existan voces en su seno para aminorar los excesos en que pueda incurrir dicho partido mayoritario, puede llevar a un gobierno a la tiranía o a la corrupción. Esto es, tal dominio absoluto, aun siendo producto de la voluntad popular, puede llevar dentro de sí la semilla que, de germinar, puede dar al traste con la razón de ser de la democracia. Es por ello que los miembros de la Asamblea Constituyente, con gran sabiduría, otorgan el derecho de representación de los partidos minoritarios en el evento, y solamente en tal evento, de que un partido eligiese más de dos terceras partes de los miembros de cualquiera o de ambas cámaras legislativas. Tal derecho otorgado a los partidos de minoría, al lograr rango constitucional, fortalece el proceso democrático, y no puede dejarse sin efecto sin que la voluntad del pueblo, que es la fuente del poder público, así lo determine.

Los peticionarios alegan que la Sec. 7 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico es vaga e imprecisa en tanto en cuanto no define lo que constituye un partido y una candidatura. Arguyen, pues, que al referirse a "candidatura" y "partido político de minoría" los miembros de la Constituyente quisieron decir "sectores o criterios de opinión pública", por lo que la cláusula constitucional sobre minorías era una ". . . garantía para que los distintos criterios de opinión pública estén representados en la Asamblea Legislativa." (4 *Diario de Sesiones de la Convención Constituyente*, pág. 2596.) Y, refiriendose al Informe de

la Comisión Legislativa de dicha Asamblea Constituyente, citan la siguiente expresión:

"Esta fórmula de garantía a las minorías se ha producido y recomendado por la Comisión como un medio de dar justa interpretación a la voluntad del pueblo y no como una concesión a partidos políticos." 4 *Diario de Sesiones de la Convención Constituyente*, pág. 2596.

Una lectura de las citas que hacen los peticionarios sobre las manifestaciones vertidas por algunos de los miembros de la Constituyente, a la luz del lenguaje utilizado en los párrafos primero y último de la Sec. 7, (¹) no deja lugar a dudas que los términos "candidatura" y "partido" habrían de ser definidos por ley, y que para cualificar como partido de minoría habría de requerir que éste obtuviera un mínimo de votos a favor de su candidato a Gobernador, cuyo mínimo habría de ser fijado por ley. Luego, la Sec. 89 (a) de la Ley Electoral (16 L.P.R.A. sec. 276) delineó el mecanismo necesario para que un partido de minoría lograra la representación de minoría que otorgó la Sec. 7 del Art. III, sin hacer mención alguna de los "sectores" o "criterios" de opinión, ya que estos conceptos se referían a partidos políticos. Más aun, la Sec. 89 (a) de la Ley Electoral deja aclarado que "candidatura" es el conjunto total de los candidatos postulados por *un solo partido* en su propia columna en la papeleta electoral, y en el caso de "partidos" que fueron coligados para las elecciones generales inmediatamente precedentes, o que serán coligados para las inmediatamente siguientes, el conjunto *total* de los candidatos de dichos partidos postulados en sus propias columnas en la papeleta electoral. En resumen, la Sec. 89 (a) le da vigencia a la ya mencionada disposición constitucional que se

---

(¹) "La Asamblea Legislativa adoptará las medidas necesarias para reglamentar estas garantías, y dispondrá la forma de adjudicar las fracciones que resultaren en la aplicación de las reglas contenidas en esta sección, así como el número mínimo de votos que deberá depositar un partido de minoría a favor de su candidato a Gobernador para tener derecho a la representación que en la presente se provee."

refería a "un solo partido" o "bajo una sola candidatura". El término "candidatura" incluye tanto el conjunto total de los candidatos postulados por un solo partido como los postulados para dos o más partidos coligados. Cualquier imprecisión o vaguedad de la disposición constitucional en cuestión quedó aclarada con la legislación que al efecto la Asamblea Legislativa aprobó "por delegación expresa de la Constitución."

El requisito impuesto por la Sec. 89 (a) de la Ley Electoral con respecto al porcentaje de votos que debe obtener el candidato a Gobernador de un partido de minoría para tener derecho a la representación minoritaria otorgada por la Sec. 7 del Art. III es razonable y por tanto constitucionalmente permisible. Véase *Jenness* v. *Fortson,* 403 U.S. 431 (1971). El Estado tiene un derecho a exigir la existencia de un respaldo sustancial del electorado a un partido político en aras de protegerse de candidaturas frívolas o numerosas. Durante las reuniones de la Asamblea Constituyente hubo expresiones en el sentido de que la proliferación de partidos y la conservación artificial de partidos que no contaban con suficiente fuerza electoral, con el consiguiente fraccionamiento de la responsabilidad política ante el pueblo, debilitan la democracia, toda vez que la multiplicación de partidos políticos pequeños les hacen endebles para expresar sus criterios. 3 *Diario de Sesiones,* págs. 2026, 2028. Coincide este criterio con el expresado por Madison en los escritos publicados en los años en que se debatía la formación de los Estados Unidos de América al decir que los partidos en astillas y el faccionalismo desenfrenado podían causar grave daño al tejido gubernamental, *The Federalist,* No. 10 (Madison).

No se trata de un candidato independiente que ante la encrucijada de optar por ser candidato independiente sin atarse a un partido político, encuentre que los requisitos de ley para así hacerlo son en extremo onerosos. Se sabe que en esos casos el Estado debe proveerle una oportunidad ase-

quible. *Storer* v. *Brown*, No. 72-812, resuelto en 26 de marzo de 1974. Véase *Williams* v. *Rhodes*, 393 U.S. 23 (1968).

Por los fundamentos aquí consignados, concurro con el resultado de la opinión del Tribunal.

—O—

Voto particular del Juez Asociado Señor Díaz Cruz.
San Juan, Puerto Rico, a 31 de Mayo de 1974

Concurro enteramente con la opinión mayoritaria.

Hay considerable argumento entre las partes en cuanto al propósito de la Asamblea Constituyente de dar representación en la Legislatura a los llamados grupos de opinión minoritaria. No existe mejor criterio conocible para percibir un grupo de opinión que su consolidación en partido político lo que indudablemente llevó la Constituyente a vincular la representación de minorías al concepto "partido" en vez de "candidato" al escribir el Art. III, Sec. 7 de nuestra Constitución. (¹)

El tribunal de instancia declaró la citada Sec. 7 inoperante y postergada por disposiciones de la Carta de Derechos de la Constitución del Estado Libre Asociado por entender que vulnera el principio de que cada voto debe tener el peso equiparable a la plena participación del elector que lo emite. La Constitución es un todo y deberá interpretarse respetando la integridad de todas y cada una de sus disposiciones. Los derechos civiles del Pueblo que con sus votos aprobó la Consti-

---

(¹) Al tomar ese curso la Asamblea Constituyente y subsiguientemente el Pueblo enaltecieron una de las básicas libertades de la democracia, la de asociarse en agrupaciones políticas. "No puede ya ponerse en duda que la libertad de asociarse con otros para el común impulso de postulados e ideas políticas es una forma de 'ordenada actividad de grupo' protegida por las Enmiendas 1a. y 14a. [citas]. El derecho a asociarse con el partido político de su preferencia es parte integrante de esta básica libertad constitucional. [citas]" *Kusper* v. *Pontikes*, 414 U.S. 51 (1973), 38 L.Ed.2d 260. Igual protección ofrecen el Art. II, Sec. 4 (derecho del pueblo a reunirse en asamblea pacífica y pedir reparación de agravios) y el Art. II, Sec. 7 (nadie será privado de su libertad ni le será negada la igual protección de las leyes) de la Constitución del Estado Libre Asociado.

tución, quedaron no sólo garantizados sino también regulados por la propia voluntad popular que en forma espontánea aprobó el método de elección de legisladores de minoría bajo el Art. III, Sec. 7. No encuentro en ello erosión de derechos superiores a otros, sino una restricción autoimpuesta, libremente consentida por el Pueblo mismo al aprobar su Constitución.