Opinión disidente emitida por el
Juez Asociado Señor Rivera Pérez.
La mayoría procede a denegar nuevamente por académico el este recurso. Aunque no utilizan expresamente como fundamento tal doctrina, su razonamiento queda allí enmarcado. Sostienen que no debe expedirse el auto solicitado para resolver una controversia que ya ha sido resuelta por la Rama Ejecutiva y la Legislativa. Ciertamente, el proceso político entre la Rama Legislativa y la Ejecutiva, dirigido a crear fuentes adicionales de recaudo para el año fiscal 2005-2006, concluyó. No obstante, tal controversia es distinguible de ésta. La primera quedó enmarcada como una cuestión política; la nuestra contiene un asunto justiciable de alto interés público.
*377 Puntualizan que dicho tipo de recurso sólo ha de expedirse “en circunstancias extraordinarias”, cuando el balance de los intereses implicados amerita la intervención del foro judicial. Sostienen que este caso no contiene tales circunstancias. Discrepamos de tal criterio y curso de acción.
El asunto relacionado con la intervención impropia e indebida del Gobernador de Puerto Rico con los fondos públicos asignados por estatuto a la Oficina del Contralor, está presente, tiene vigencia y está vivo. Conducta de tal naturaleza ha sido observada por el Gobernador en forma recurrente y repetitiva, incurriendo en acciones muy serias, graves y violatorias del esquema democrático constitucional vigente. El Gobernador de Puerto Rico no tiene el poder ni la facultad para, mediante una orden ejecutiva, enmendar una ley vigente que está constitucionalmente obligado a cumplir y a hacer cumplir. Está impedido de incurrir en tal actuación No puede actuar así para intervenir los fondos asignados por disposición legislativa a la Oficina del Contralor para sufragar sus gastos de operación. El cuadro en el caso ante nos contiene las “circunstancias extraordinarias” que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal sea imprescindible. La “prudencia y la experiencia” es el fundamento principal para hacer mandatoria la intervención de este Tribunal, y así proteger y garantizar a nuestro pueblo “los mejores intereses de la justicia y la democracia”.
Al no intervenir este Tribunal en este asunto, claudica en su ministerio de proteger y garantizar al pueblo su democracia, frente a la crisis constitucional más grave y seria de su historia. Hoy, con este nefasto pronunciamiento, el pueblo no ha contado con su principal recurso para garantizar que su sistema de gobierno democrático funcione: el TRIBUNAL SUPREMO DE PUERTO RICO. DISENTIMOS con vehemencia de lo aquí actuado por la Mayoría.
*378 I
El presupuesto de la Oficina del Contralor de Puerto Rico (el Contralor) ascendía a la suma de $42,000,000 para el año fiscal 2005-2006.
El Gobernador de Puerto Rico (el Gobernador) dispuso el desembolso de los fondos asignados a la Rama Legislativa, a base de lo establecido en la Resolución Conjunta Núm. 927 de 30 de junio de 2004, mediante la Orden Ejecutiva 2005-58 de 30 de agosto de 2005, enmendada por la Orden Ejecutiva 2005-78 de 16 de diciembre de 2005. La asignación presupuestaria a la Rama Legislativa totalizó $106,600,000.
El 26 de abril de 2006, el Gobernador promulgó la Or-den Ejecutiva 2006-10 (OE-2006-10) por la que instruyó al Secretario de Hacienda de Puerto Rico (el Secretario) sobre cómo proceder con el desembolso de dichos fondos durante mayo y junio de 2006. Por virtud de ésta, redujo a la Oficina del Contralor su partida de nómina a un setenta y cinco por ciento de los fondos asignados a esa dependencia, bajo custodia y control del Secretario. Tal actuación tuvo el efecto directo de reducir unilateralmente los fondos disponibles para la operación de esa dependencia.
Mediante comunicación de 25 de abril de 2006, cursada antes de que el Gobernador emitiera la OE-2006-10, el Contralor le solicitó por escrito que desistiera de su intención de intervenir con sus fondos asignados por disposición legislativa para los gastos de operación de su oficina. No recibió ninguna respuesta, salvo copia de la OE-2006-10.
El Contralor presentó un recurso de mandamus contra el Gobernador y el Secretario, invocando nuestra jurisdicción original. Alega que el Gobernador carece de autoridad constitucional o estatutaria para reducir unilateralmente los fondos públicos destinados a una entidad para sufragar sus gastos, que no forma parte de la Rama Ejecutiva. Sostiene que cualquier intento a esos efectos viola el principio *379 constitucional de separación de poderes y la garantía de independencia funcional que disfruta esa oficina bajo la Constitución de Puerto Rico y nuestra infraestructura jurídica estatutaria. Solicita una orden dirigida al Gobernador para que se deje sin efecto la parte de la OE-2006-10 que pretende intervenir con sus fondos. Solicita, además, le ordenemos al Secretario que certifique la suma total de los fondos, bajo su custodia y control, disponible para sufragar los gastos presupuestados de su oficina por disposición de la Resolución Conjunta Núm. 927, supra.
El 1 de mayo de 2006, el Gobernador y el Secretario presentaron un escrito solicitando a este Tribunal la desestimación del recurso de mandamus. Arguyen que la alegada crisis fiscal que sufrió Puerto Rico se reduce a que el gasto gubernamental presupuestado para el resto del año fiscal asciende a la suma de $2,000,000,000. No obstante, hay disponible sólo $1,021,000,000, que se estimó habrían de ingresar en las arcas del Departamento de Hacienda durante mayo y junio de 2006.. El Gobernador sostiene que esta situación lo obligó a utilizar la autoridad que le confiere el Art. VI, Sec. 6 de la Constitución de Puerto Rico(1) para reducir de forma sustancial los desembolsos de fondos públicos a diferentes organismos gubernamentales, de forma tal que los recursos económicos con que ha de contar el Gobierno durante mayo y junio del año fiscal 2005-2006 puedan ser utilizados para garantizar que el Pueblo reciba los servicios esenciales de seguridad y salud, así como para asegurar el repago de las obligaciones del Gobierno. Ex-presa que mostró deferencia a la importancia de las funciones del Contralor, pues redujo el presupuesto de esa oficina a sólo un setenta y cinco por ciento de la partida de nómina, cuando a la Rama Ejecutiva la redujo a un cuarenta y seis por ciento y a la Rama Legislativa a un cincuenta por ciento.
El Gobernador puntualiza que el Contralor no estuvo *380 satisfecho e insistió en recibir de forma inmediata el cien por ciento de sus fondos para los últimos dos meses del año fiscal en cuestión, mayo y junio de 2006; no obstante la alegada crisis fiscal que sufrió el país. Expresa que, a diferencia del Contralor, el Juez Presidente del Tribunal Supremo de Puerto Rico y el Presidente del Senado reconocieron la magnitud de la crisis fiscal del país y que, aunque opinaron que los poderes concedidos al Gobernador mediante la See. 8 del Art. VI de la Constitución(2) no permiten que se reduzcan los desembolsos a sus respectivas instituciones, “por lo menos han tenido suficiente solidaridad con el Pueblo como para limitar sus reclamos a que se les reconozca un crédito pagadero durante el próximo año fiscal”. Afirma que si este Tribunal accede a lo que solicita el Contralor, “se verá enfrascado en la tarea de determinar cómo y a qué fin destinar los fondos del Estado, en medio de una crisis fiscal, pero sin contar con las destrezas y poderes para manejar tal responsabilidad de forma efectiva”. Sostiene que esa no es nuestra tarea. El Gobernador y el Secretario alegan que tales consecuencias pueden ser evitadas desestimando el recurso. Sostienen su pedimento en la falta de jurisdicción de este Tribunal para actuar, porque lo solicitado por el Contralor es inoportuno, el recurso plantea una cuestión política y el Contralor carece de capacidad jurídica y de legitimación activa para presentar su recurso. Por último, plantean que el recurso no fue perfeccionado a tenor con la ley, porque la petición no fue juramentada y pretende utilizar el vehículo de mandamus para cuestionar una actuación que involucra el ejercicio de la discreción del Primer Ejecutivo.(3)
El 5 de mayo de 2006, el Contralor replicó por escrito a la solicitud de desestimación presentada. Controvierte la caracterización que hicieran el Gobernador y el Secretario *381 sobre la cifra de $2,000,000,000 a la que alegadamente ascendió el gasto gubernamental presupuestado para el resto del año fiscal en cuestión, o sea, mayo y junio de 2006. Afirma que tal caracterización no es correcta. Sostiene que no se trata de un “gasto gubernamental presupuestado”, sino de un estimado de los desembolsos que se necesitarían hacer para absorber el gasto gubernamental, lo que incluye el gasto presupuestado y el gasto no presupuestado. Puntualiza que en eso exactamente es que reside la crisis alegada. Además, afirma que el estimado de $2,000,000,000 incluye los excesos en gastos proyectados sobre lo presupuestado en los que, para el 6 de abril de 2006, habían incurrido por lo menos cuarenta y ocho agencias del gobierno de la Rama Ejecutiva. Sostiene que el Juez Presidente del Tribunal Supremo, mediante carta, le informó al Gobernador que la Rama Judicial contemplaba terminar el año fiscal 2005-2006 con “un sobrante a consecuencia de las medidas de austeridad que tomamos durante el presente año”. Arguye que algo similar aduce la carta del Presidente del Senado al Gobernador. Expresa que, con relación a la cifra de $1,021,000,000, la realidad es que no se explicó al país adecuadamente cómo se había formulado. Al presente, ni el Gobernador ni el Secretario han presentado cifra alguna sobre cuánto se recaudó y cuánto queda por cobrar en concepto de la contribución sobre ingresos pagadera el 18 de abril de 2006. El Contralor sugiere cuál es la causa u origen de la alegada crisis fiscal. Alega que el Gobernador está facultado y obligado a establecer los ajustes necesarios en la Rama Ejecutiva, para que los desembolsos no sobrepasen los fondos públicos disponibles. El Contralor formula ciertas y determinadas interrogantes sobre tal asunto. ¿Cuándo es que el Gobernador está obligado a realizar tales ajustes en la Rama Ejecutiva? ¿Cuándo era inminente que se habría de agotar los fondos públicos en esa rama de gobierno?, ¿tan pronto ese escenario se divisó al final del camino? Afirma que es de conocimiento público *382 que el Gobernador anunció muy temprano, durante el transcurso del año fiscal en cuestión, que ya divisaba ese escenario en la Rama Ejecutiva. Sostiene que en ese momento existían dos cursos de acción como alternativas. Primero, comenzar un proceso ordenado de recorte de gastos en la Rama Ejecutiva. Segundo, confiar en que en algún momento se aprobarían medidas adicionales de recaudo. Afirma que el Gobernador descansó en la segunda opción. Sostiene que la prudencia y la Constitución de Puerto Rico requerían que se recurriera desde entonces a la alternativa de un recorte ordenado de gastos en la Rama Ejecutiva. Afirma que no debió producirse nunca lo que vivimos, un gobierno parcialmente cerrado. Puntualiza que el proceso político, en aquel momento en marcha en la Rama Legislativa, con el que el Gobernador nos indicó que no debíamos intervenir, fue el resultado de acciones u omisiones que se arrastraban, por lo menos, desde el comienzo del año fiscal 2005-2006. Sostiene que el actual exceso en los gastos de la Rama Ejecutiva sobre los presupuestados y por sobre los estimados de ingresos de esa rama de gobierno, fue sometida al foro político porque no se atendió adecuadamente como correspondía. El Contralor cree que el origen de tal exceso es la falta de control de los gastos de la Rama Ejecutiva, en previsión de una negativa legislativa a aprobar legislación para allegar recaudos adicionales.
El Contralor delimita la controversia ante nos. ¿Contiene la See. 6 del Art. VI de la Constitución de Puerto Rico, supra, y la ley que implanta tal precepto, concebidas para momentos de crisis, cierto límite? Por el contrario, ¿le otorgan nuestra Constitución y la infraestructura jurídica estatutaria al Gobernador de Puerto Rico la facultad y el poder de producir una crisis, y luego manejar casi a su entero arbitrio el presupuesto “de todo el gobierno”, y no sólo el de la Rama Ejecutiva?
El Gobernador, en su escrito, nos solicitó la desestimación del recurso porque, entre otras cosas, de expedirse el *383 recurso hubiéramos interferido con las negociaciones que se conducían, en ese momento, entre las Rama Ejecutiva y la Legislativa. Por su parte, el Contralor arguye que el escrito de la parte recurrida nos propone que le permitamos al Gobernador negociar desde una posición de poder, en una situación fiscal como la que existió en ese momento, aunque carezca de tal facultad, a pesar de los reclamos ante este Tribunal de la parte directamente afectada por el ejercicio de ese poder. Afirma que ese no es el “fino balance” entre los poderes de gobierno que hemos evocado en el pasado. Nos refiere a nuestra opinión en el caso Hernández Agosto v. López Nieves, 114 D.P.R. 601, 622 (1983).
El Contralor hace referencia a la determinación de este Tribunal en Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006), de desestimar por académico una acción presentada ante nos por los presidentes de los cuerpos legislativos ante una acción similar del Gobernador a la del caso ante nos. Sostiene que, en aquella ocasión, la actuación de este Tribunal podía explicarse por razón de prudencia. Arguye que este Tribunal procedió de esa forma porque el Gobernador desistió de su actitud de intentar reducir unilateralmente el presupuesto de la Rama Legislativa y permitió que el proceso político y sus componentes armonizaran sus diferencias sin nuestra intervención. (4) Arguye que tras ese evento, no le parece justificada una ulterior exhortación a la “paciencia y serenidad con el proceso político”. Sostiene que existe una diferencia dramática entre aquel escenario y el que nos ocupa. En el caso Presidente de la Cámara v. Gobernador, supra, el Gobernador, mediante la Orden Ejecutiva 2005-78, supra, desistió de su curso de acción, que los allí demandantes consideraban inconstitucional. En este caso el Gobernador insistió en tal curso de acción. Arguye que el escrito del Gobernador pro-pone que este Tribunal, por segunda vez, demuestre “pa *384 ciencia y serenidad” ante su reiterada violación constitucional.
El Contralor rebate extensamente cada uno de los argumentos de derecho en los cuales el Gobernador y el Secretario sostienen su pedimento de desestimación del recurso. Pasamos de inmediato a considerarlos.
II

Mandamus

El mandamus es un recurso extraordinario de equidad “altamente privilegiado” que emite el Poder Judicial para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir con un acto que la ley expresamente ordena como un deber resultante de un empleo, cargo o función pública.(5)
El requisito primordial del recurso de mandamus es que se trate de un deber ministerial impuesto por ley. La jurisprudencia ha establecido que la determinación de la procedencia del auto depende de si la actuación solicitada es un deber ministerial o si, por el contrario, involucra el ejercicio de discreción, en cuyo caso no puede expedirse.(6) El acto es ministerial cuando la Constitución de Puerto Rico y la ley prescriben y definen el deber que tiene que ser cumplido con tal precisión y certeza que nada deje al ejercicio de la discreción o del juicio. Cuando el acto que debe ser cumplido encierra el ejercicio de discreción o juicio, no considerado ministerial, está fuera del ámbito del recurso de mandamus. La decisión de lo que es o no “un deber ministerial” no es algo que se pueda determinar mediante la aplicación de una fórmula inflexible.(7) Si el deber surge o *385 no claramente de las disposiciones estatutarias aplicables es una cuestión sujeta a interpretación judicial que no depende de un juicio a priori, fundado exclusivamente en la letra del estatuto. Tal determinación ha de surgir del examen y análisis de todos los elementos útiles a la función interpretativa, del examen paciente y riguroso de la intención legislativa, de la evaluación de todos los elementos de juicio disponibles para auscultar el propósito y significado del estatuto en cuestión.(8)
Al considerar la solicitud de expedición de un auto de mandamus no es suficiente que el peticionario tenga un derecho claro a lo que solicita ni que el demandado tenga la obligación de permitir el ejercicio de ese derecho. Por tratarse de un auto “altamente privilegiado”, los tribunales tienen necesariamente que medir la totalidad de las circunstancias presentes, tanto al determinar si debe o no ex-pedirse el auto, como también al fijar el contenido de su disposición, de haberlo expedido. El remedio se concede sólo cuando el tribunal está convencido de que con ello se cumplirán propósitos de utilidad social e individual. Es indispensable estimar los efectos que tendrá la intervención judicial en el adecuado cumplimiento de las responsabilidades y los deberes del funcionario afectado, al amparo de la Constitución de Puerto Rico y de la ley. Resulta imperativo buscar el más fino “balance y equilibrio” entre los diversos intereses en conflicto.(9)
Este Tribunal tiene la obligación de tomar en cuenta, al momento de considerar un recurso como el presente, el velar y proteger los intereses públicos que puedan ser perjudicados con la expedición del auto solicitado. Tiene el deber ineludible de proteger y garantizar nuestra forma republicana de gobierno, evitando una intromisión indebida de la Rama Judicial con los procesos de las ramas políticas de gobierno. El criterio que gobierna el asunto ante nos con *386 siste en el impacto que la expedición del auto solicitado y nuestra intervención pudiera tener sobre el interés público inmanente del esquema democrático de la Constitución de Puerto Rico. Este recurso sí presenta las “circunstancias extraordinarias” que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal sea imprescindible. La experiencia vivida en dos ocasiones, relativa a alegadas actuaciones iguales o similares del Gobernador nos obliga, como medida prudencial, a intervenir para proteger y garantizar “los mejores intereses de la justicia y la democracia”. Nuestra intervención en este asunto resulta imprescindible por razón de utilidad social e individual, por la importancia y relevancia que tiene para nuestro sistema constitucional de gobierno democrático. Nuestra intervención resulta mandatoria ante el reiterado incumplimiento del Gobernador con sus deberes y obligaciones ministeriales, al amparo de la Constitución de Puerto Rico y de la ley.
III

Doctrina de academicidad

Por entender que la mayoría deniega la expedición del recurso por academicidad por no existir, en la actualidad, un deber ministerial de ley que cumplir por parte del Gobernador, habremos de discutir y aplicar dicha doctrina al caso ante nos.
Hemos expresado que los tribunales pierden su jurisdicción sobre un caso por academicidad cuando ocurren cam-bios tácticos o judiciales durante el trámite judicial de una controversia que tornan en académica o ficticia su solución.(10) En Asoc. de Periodistas v. González, 127 D.P.R. 704
*387 (1991), citando al profesor Tribe, expusimos que “[u]na vez se determina que un caso es académico los tribunales, por imperativo constitucional (ausencia de ‘caso o controversia’) o por motivo de autolimitación judicial, deben abstenerse de considerarlo en sus méritos”.(11) Lo anterior es corolario del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas, surgidas entre partes opuestas que tienen un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.(12) Persigue, además, eludir el uso innecesario de recursos judiciales, asegurar la existencia de contiendas que sean vigorosamente litigadas y evitar precedentes innecesarios.(13) Al analizar la academicidad de un caso, debemos evaluar los eventos anteriores, próximos y futuros, a fin de determinar si su condición de controversia viva y presente subsiste con el transcurso del tiempo.(14) Existen excepciones a la doctrina de academicidad. En virtud de ellas, los tribunales pueden atender un caso aunque haya habido cambios que parecieran tornar académica la controversia. Estas son las siguientes: (1) cuando se plantea en el caso una cuestión recurrente o repetitiva del asunto planteado que tiende a evadir la revisión judicial; (2) en aquellos casos en los que la situación de hechos ha sido modificada por el demandado, pero no tiene características de permanencia; (3) donde aspectos de la controversia se tornan académicos, pero persisten importantes consecuencias colaterales, y (4) cuando se ha certificado por el tribunal una clase en conformidad con la Regla 20 de Pro *388 cedimiento Civil,(15) y la controversia se torna académica para un miembro de la clase, mas no para su representante.(16)
La excepción sobre el carácter recurrente o repetitivo de la controversia exige el estudio de tres factores: la probabilidad de la recurrencia, las partes involucradas en el procedimiento y la probabilidad de que la controversia evada la revisión judicial.(17) Para que opere la referida excepción, la recurrencia no tiene que ser entre las mismas partes.(18)
Además del carácter recurrente o repetitivo del asunto planteado y de las partes en el litigio, dicho asunto debe ser de tal naturaleza que puede evadir su adjudicación o revisión. Esto sucede con mayor frecuencia en aquellas controversias que son, de por sí, de muy corta duración, aunque pueden existir otras razones, además de la breve-dad cronológica, que ocasionen que una controversia sea capaz de eludir la revisión judicial.(19)
Aunque los tribunales pierden su jurisdicción sobre un asunto cuando ocurren cambios durante el trámite judicial de un caso que hacen que éste pierda actualidad, los cam-bios fácticos o judiciales a los que hace referencia la jurisprudencia no pueden ser, bajo ninguna circunstancia, resultado de una actuación del demandado para burlar nuestra facultad revisora con respecto a un caso que está sub júdice. En la situación en la que el demandado cese de su actuación ilegal o impropia de forma voluntaria, sin que existan garantías de que en el futuro no habrá de incurrir nuevamente en tal conducta, el caso no se tornará académico. Este cese voluntario no impedirá que los tribunales puedan ejercer su función de determinar la legalidad *389 del acto incurrido y de decidir sobre el caso ante sí, pues de lo contrario, sería permitir que el demandado vuelva a incurrir en la conducta desistida. (20) El demandado debe demostrarle al tribunal que no existe una probabilidad razonable de que la conducta ilegal alegada se repita.(21)
Este caso contiene una situación verdaderamente preocupante respecto a la aplicación de los principios que comprenden la doctrina de la academicidad frente a violaciones graves, muy serias y recurrentes a la Constitución de Puerto Rico y a la ley por parte del Gobernador.
Tomamos conocimiento judicial que el Gobernador informó desde el principio del cuatrienio sobre la existencia de un déficit presupuestario. También tomamos conocimiento judicial del hecho que desde principio del año fiscal 2005-2006 el Gobernador anunció que los gastos presupuestados habrían de exceder los estimados de ingresos que han de recaudarse.
El Gobernador optó, al principio del año natural 2006, por reducir unilateralmente mediante una orden ejecutiva los fondos asignados por estatuto a la Rama Legislativa. Tal acción produjo la presentación de dos pleitos por los Presidentes de los cuerpos legislativos ante el Tribunal de Primera Instancia. Dichos asuntos fueron traídos ante nos mediante unos recursos de certificación. El Gobernador solicitó que se archivaran por académicos esos asuntos, porque había depuesto su actitud de reducirle a la Rama Legislativa su presupuesto, por haber sido identificadas unas fuentes de ingresos que excedían los estimados de ingresos formulados previamente y que hacían innecesaria su intervención con el presupuesto de esa rama de gobierno. Hace escasamente unos meses este Tribunal tuvo la oportunidad de dirimir esa controversia y de pautar norma al respecto y una mayoría decidió no hacerlo por estimar que el asunto *390 se convirtió en académico. Disentimos de tal curso de acción sin opinión escrita, en aquel momento, porque entendíamos que el Gobernador, con su proceder, estaba tratando de evadir la revisión de su actuación por este Tribunal. Nos referimos al caso Presidente de la Cámara v. Gobernador, supra. La mayoría entendió que aquella controversia era académica porque no existía una probabilidad razonable de que volviera a repetirse y porque era muy especulativo concluir que una situación de crisis fiscal pudiera suscitarse en el futuro o que el Gobernador volviera nuevamente a reducir unilateralmente los fondos disponibles de otra rama de gobierno para sufragar sus gastos, presupuestados por disposición legislativa. No fue así.
Posteriormente el Gobernador redujo no sólo los fondos asignados al Contralor, sino los de la Rama Judicial y, nuevamente, los de la Rama Legislativa. Nos preguntamos, ¿cuándo era inminente que se le agotarían los fondos públicos disponibles para la Rama Ejecutiva? Lo cierto es que la insuficiencia de fondos de esa rama de gobierno apunta a mayo y junio de 2006, el final del año fiscal 2005-2006. ¿Desde cuándo se conocía tal eventualidad? ¿Qué medidas y ajustes realizó el Gobernador para reducir o eliminar tal escenario?
No tenemos duda alguna de que la actuación del Gobernador, de hace escasamente unos meses, de deponer su actitud de intervenir los fondos de la Rama Legislativa, tuvo el propósito directo de tornar en académica aquella controversia que estaba ante nos. Por eso disentimos.
Este Tribunal no debió dejar en manos del Gobernador la potestad de decidir cuándo este Foro habría de revisar un planteamiento tan serio sobre actuaciones de su parte de violación a principios y derechos constitucionales y estatutarios. Tenemos ante nos un caso que fue traído con la premura y la urgencia que requiere la situación. El Gobernador ha recurrido en su conducta, por lo que no existe garantía alguna de que en el futuro no habrá de incurrir *391 nuevamente en acciones similares. No ha demostrado la inexistencia de una probabilidad razonable de que vuelva a repetirse. Por el contrario existe, ante el cuadro político de un gobierno compartido, la probabilidad razonable de que una situación igual o similar vuelva a producirse. Persisten en este caso importantes consecuencias no colaterales sino directas, principalmente relacionadas con el funcionamiento del sistema de gobierno democrático del país que le garantiza al Pueblo la Constitución de Puerto Rico.
La mayoría permite con su inacción que el Gobernador vuelva a eludir nuestra revisión judicial e incurrir en el futuro en una conducta igual o similar. Concluimos que este caso no es académico ni inmeritorio y que el país está pendiente del cabal cumplimiento de nuestro ministerio. Hoy este Tribunal claudica su función de preservar, proteger y garantizar al Pueblo de Puerto Rico el funcionamiento efectivo y eficiente de su sistema de gobierno democrático.
IV

Legitimación activa

Tenemos la obligación ineludible de cerciorarnos de que las partes que promueven la controversia ante nos están particularmente capacitadas para así hacerlo y de que su interés es de tal naturaleza que, con toda probabilidad, habrán de proseguir su causa de acción vigorosamente y habrán de traer a la atención del tribunal las cuestiones en controversia. (22)
La doctrina de legitimación activa exige que el promovente de la acción demuestre que cumple con determinados requisitos indispensables, a saber: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y *392 preciso, y no abstracto e hipotético; (3) que la causa de acción debe surgir bajo el palio de la Constitución o de una ley, y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada.(23)
Tanto el Gobernador como el Secretario sostienen que el Contralor carece de legitimación activa para presentar el recurso ante nos porque no cumple con los requisitos indispensables para que el promovente de la acción demuestre que ha sufrido un daño claro, palpable e inmediato. Sostienen que el daño reclamado por el Contralor es de naturaleza generalizada que debe ser atendido en la esfera política. No les asiste la razón.
El asunto ante nos se refiere a actuaciones del Gobernador que han interferido con las operaciones de la Oficina del Contralor, cuyas funciones están constitucionalmente dirigidas a fiscalizar a las tres ramas de gobierno sobre la legalidad del gasto de los fondos públicos.
El Contralor ha cumplido con su obligación de alegar y sostener adecuadamente que la actuación del Gobernador le ha causado un daño claro, palpable, preciso e inmediato a su oficina. Alegó, además, que su causa de acción surge de la Constitución de Puerto Rico y de la ley; que existe una conexión entre el daño sufrido a la operación de su oficina —que tiene una función constitucional— y la acción ejercitada. Luego de varios intentos infructuosos del Contralor por obtener una reacción oficial del Secretario respecto a la forma como se harían los desembolsos para el pago de su nómina, según la OE-2006-10, el 5 de mayo de 2006 el Secretario notificó por escrito al Contralor que tal reducción tendría un efecto inmediato. Ello provocó el ajuste, por parte del Contralor, de los horarios y días de trabajo del personal de su oficina con el propósito de enfrentar la reducción de los fondos bajo la custodia y el control del Secretario para el pago de nómina durante la pri *393 mera quincena de mayo de 2006. Ello se agravó por el hecho de que para el 5 de mayo de 2006, fecha de la referida notificación del Secretario, habían concluido cinco días de servicios prestados por todo el personal de la Oficina del Contralor. El Contralor entendió que del lenguaje contenido en la OE-2006-10, respecto a la reducción de los fondos bajo la custodia y el control del Secretario, era imposible descifrar cómo se harían los desembolsos referentes a los gastos de nómina.(24)
La acción tardía del Secretario de proveer directrices al respecto provocó que el Contralor realizara ajustes en servicios, horarios y salarios para poder lograr la reducción requerida en la nómina por el Secretario. Estos ajustes tuvieron que ser realizados durante los seis días laborables que restaban de la primera quincena de mayo de 2006. Como resultado de lo anterior, el personal de la Oficina del Contralor sufrió una reducción de su jornada de trabajo, de modo que las horas trabajadas no excedieran el equivalente al setenta y cinco porciento de su salario. Tal proceder afectó en forma directa e inmediata la operación de esa dependencia.
El Gobernador y el Secretario sostienen que el Contralor no tiene capacidad jurídica para instar el recurso, porque sus facultades para actuar son limitadas y entre ellas no está la de incoar pleitos y recursos judiciales, fuera del ámbito específico de hacer valer sus citaciones y órdenes investigativas.
Si la facultad del Contralor para cuestionar en los tribunales una actuación de la Rama Ejecutiva de naturaleza inconstitucional, que afecta en forma directa la operación *394 de su oficina, estuviera condicionada a la previa autorización por la Rama Legislativa, equivaldría a que esta última controlaría la efectiva operación de la Oficina del Contralor, a quien la Constitución de Puerto Rico le quiso otorgar autonomía administrativa, funcional y fiscal frente a las tres ramas de gobierno. Ello colocaría al Contralor a merced del Poder Legislativo, aun en aquellas instancias en que la actuación de dicha rama de gobierno pudiera interferir con su autonomía. Esto es contrario a la intención de la Asamblea Constituyente de que el Contralor no estuviera sujeto a control alguno por parte de ninguna de las tres ramas de gobierno y pudiera llevar a cabo, con independencia, sus prerrogativas constitucionales.
No tenemos duda alguna de que el Contralor tiene legitimación activa y capacidad jurídica para instar el recurso ante nos. Máxime, cuando su acción pretende la intervención del Poder Judicial para reivindicar sus prerrogativas constitucionales y estatutarias frente a las actuaciones del Gobernador y del Secretario, que interfirieron con su autonomía y rol constitucional.
V

Cuestión política; justiciabilidad de las causas

Consideramos que el asunto que plantea este caso debe ser objeto de determinación judicial por ser justiciable. La autoridad para analizar los aspectos relacionados a la justiciabilidad de las causas, nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas, que tienen interés real en obtener un remedio que afecte sus relaciones jurídicas.(25) Los tribunales nos imponemos las limitaciones que emanan de esa doctrina para, entre otras cosas, observar y garantizar el justo balance que se re *395 quiere de las distintas ramas de gobierno en la administración de la cosa pública. El análisis de este principio es, por lo tanto, imperativo y necesario dentro de nuestro sistema de separación de poderes. Las limitaciones que surgen de éste imponen un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que, de otro modo, constituiría una clara amenaza para la calidad democrática de nuestro sistema.(26)
La aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determinan la jurisdicción de los tribunales, particularmente con relación a las controversias que se le presentan, al amparo de los derechos que garantiza nuestra Constitución y la democracia que instrumenta. Se trata, pues, de una cuestión de umbral que debemos analizar ante las controversias que nos ocupan.(27)
La doctrina de cuestión política, según desarrollada en la jurisdicción federal, surge básicamente de consideraciones sobre el principio constitucional de la separación de poderes.(28) Si en un caso hay presente una cuestión política, el caso no será justiciable y el tribunal debe abstenerse de adjudicarlo. La doctrina de cuestión política plan-tea, en esencia, que hay asuntos que no son susceptibles de determinación judicial, porque su resolución corresponde a las otras ramas del Gobierno —Legislativa o Ejecutiva— o, en última instancia, al electorado.(29) Una cuestión política no es susceptible de determinación judicial, porque su resolución corresponde propiamente al proceso político de gobierno, que se produce en las otras dos ramas, y no al Poder Judicial.(30)
Los criterios judiciales para determinar si el asunto *396 planteado constituye una cuestión política son los siguientes:
A. La Constitución delega expresamente el asunto en controversia a otra rama del Gobierno.
B. No existen criterios o normas judiciales apropiadas para resolver la controversia.
C. Resulta imposible decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales.
D. Resulta imposible tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno.
E. Hay una necesidad poco usual de adherirse sin cuestionamiento a una decisión política tomada previamente.
F. Hay el potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto.(31)
Sobre este tema, Rotunda y Nowak expresan lo siguiente:
The political question doctrine — which holds that certain matters are really political in nature and best resolved by the body politic rather than by courts exercising judicial review a misnomer. It should more properly be called the doctrine of nonjusticiability, that is, a holding that the subject matter is inappropriate for judicial consideration. ...
An important consequence of the political question doctrine is that a holding of its applicability to a theory of a cause of action renders the government conduct immune from judicial review. Unlike other restrictions on judicial review-doctrines such as case or controversy requirements, standing, ripeness and prematurity, abstractness, mootness, and abstention — all of which may be cured by different factual circumstances, a holding of nonjusticiability is absolute in its foreclosure of judicial scrutiny. (Enfasis suplido y escolios omitidos.)(32)
*397 Hemos expresado, aludiendo al profesor Raúl Serrano Geyls, que existen tres vertientes de la doctrina de cuestión política, a saber: (1) la que requiere que los tribunales no asuman jurisdicción sobre un asunto, porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (2) aquella según la cual los tribunales deben abstenerse de intervenir, bien porque no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos, y (3) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia.(33)
Si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, no estará sujeta a la revisión judicial, salvo que se ejecute incorrectamente afectando derechos constitucionales de igual jerarquía.(34)

Lo realmente importante en los casos que encierran la doctrina de cuestión política es el análisis sobre si una cláusula constitucional provee derechos que puedan ser competidos mediante una acción judicial. 
(35)

La doctrina de cuestión política debe ser aplicada en términos funcionales, a tenor con los hechos específicos de cada caso en particular. La doctrina no aplica cuando existen derechos constitucionales individuales importantes que serían afectados si el Poder Judicial no actúa. 
(36)

Como regla general, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corres *398 ponde a las otras ramas políticas del Gobierno o al electorado,(37) En Silva v. Hernández Agosto, supra, pág. 55, reiteramos nuestros pronunciamientos anteriores y ex-presamos que “ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución, y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional”. (Énfasis suplido.)(38)
El Gobernador aduce que esta controversia gira en torno a una cuestión política, por lo que este Tribunal no debe intervenir. Alega que si esta Curia adjudica el recurso instado por el Contralor, interferiría con el proceso político de formulación de política pública que ha de pautar el Gobierno ante un déficit presupuestario. Arguye que le corresponde a la Rama Ejecutiva formular política pública sobre cómo asegurar y brindar los servicios de salud y seguridad públicas, entre otros.
No hay duda de que la formulación de política pública sobre los asuntos de salud y seguridad públicas, entre otros, está delegada por la Constitución de Puerto Rico en las ramas políticas del Gobierno. No obstante, es claramente justiciable una controversia surgida a raíz de una alegación de que la Rama Ejecutiva traspasa los límites del principio de separación de poderes contenido en la Constitución de Puerto Rico, al intervenir con los fondos asignados a la Oficina del Contralor por disposición legislativa para sufragar sus gastos, que están bajo la custodia y el control del Secretario. La Rama Ejecutiva puede formular política pública sobre las áreas de salud, seguridad pública y atender un problema presupuestario, entre otros, realizando los ajustes, tomando las medidas necesarias y efectuando los desembolsos necesarios de los fondos asignados a esa rama de gobierno para sufragar los gastos pre *399 supuestados; cumple así con los límites que le impone la Constitución de Puerto Rico y la ley.
El Gobernador plantea, además, que la controversia ante nos no es justiciable porque no está madura. Coincidimos con el Contralor de que el principio de justiciabilidad es una moneda de dos caras compuesta por las doctrinas de academicidad y madurez. No es legítimo la utilización de principios de esa naturaleza como una táctica de litigación que impone a los litigantes una carrera de obstáculos cambiantes. Ya discutimos previamente el asunto sobre academicidad. ¿Es acreedor el Gobernador al carácter esencialmente prudencial que la doctrina de madurez pudiera justificar? La contestación es en la negativa. Veamos.
El Gobernador de Puerto Rico se rige, en una situación como la presente, por las Sees. 6, 7 y 8 del Art. VI de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, y por la infraestructura jurídica estatutaria vigente que regula el escenario. Al terminarse el año fiscal 2004-2005, y al no haberse aprobado por la Legislatura las asignaciones presupuestarias sugeridas por el Gobernador, continuó rigiendo para el año fiscal 2005-2006 el mismo estado de derecho estatutario para los mismos fines y propósitos, en todo lo que le fuera aplicable, a todas las ramas del Gobierno. El Gobernador está obligado por la Constitución de Puerto Rico y por la ley a autorizar los desembolsos necesarios a todas las ramas del Gobierno a tales fines. Los gastos de la Rama Ejecutiva no debían exceder los recursos económicos calculados para el año fiscal 2005-2006 para esa rama de gobierno hasta que se aprobaran los recursos económicos correspondientes, de ser necesarios. De no ser suficientes los recursos económicos disponibles para el año fiscal 2005-2006 para cubrir los gastos presupuestados de la Rama Ejecutiva para ese año, el Gobernador tenía la obligación constitucional de pagar los intereses y amortizar la deuda pública, y luego hacer los desembolsos de acuerdo con la norma de prioridades dispuesta por *400 estatuto. Este último extremo está cubierto por el Art. 4(c) la Ley Orgánica de la Oficina de Gerencia y Presupuesto. (39)
El Art. 4(c) y (d) de la Ley Orgánica de la Oficina de Gerencia y Presupuesto, 23 L.P.R.A. sec. 104(c) y (d), dis-pone, además de las normas sobre prioridades ante un escenario de esa naturaleza, las medidas administrativas que tomar el Primer Ejecutivo. Es responsabilidad y obligación del Gobernador tomar las medidas y realizar los ajustes necesarios, que estén a su alcance y en conformidad con la ley, para lograr un presupuesto balanceado al final del año fiscal, y rendir a los Presidentes del Senado y de la Cámara de Representantes, así como a las Comisiones de Hacienda de ambos cuerpos, un informe detallado de los ajustes y medidas tomadas. En dicho informe, el Gobernador debe someter sus recomendaciones a la Legislatura en cuanto a la forma de atender las obras y actividades cuya ejecución queda pospuesta, cancelándose las obligaciones correspondientes a esas obras pospuestas. Dichas obligaciones canceladas se llevarán a los libros del Secretario contra los recursos económicos disponibles en años subsiguientes, mediante el correspondiente libramiento de asignaciones. El Contralor alega en su escrito, presentado el 5 de mayo de 2006, que el Gobernador, en vez de cumplir con su deber ministerial impuesto por el Art. VI, Sec. 7 de la Constitución de Puerto Rico, supra, y por la ley —de tratar y de esforzarse en no exceder los gastos de la Rama Ejecutiva sobre los recursos económicos del año fiscal 2005-2006— no sólo se excedió en los gastos presupuestados sobre los ingresos estimados para recaudarse por el Departamento de Hacienda, sino que al 6 de abril de 2006 había incurrido en gastos adicionales no presupuestados en por lo menos cuarenta y ocho agencias de esa rama de gobierno. Ciertamente, el Gobernador no ha colocado a este Tribunal en posición de determinar que la *401 controversia ante nos no está madura. No ha acreditado, hasta el presente, su cumplimiento con ninguna de las circunstancias, de acuerdo con la ley, para convertirse en acreedor al carácter prudencial de la doctrina de madurez. No ha expresado, en forma alguna, qué medidas o ajustes realizó para que la Rama Ejecutiva terminara su año fiscal 2005-2006 con un presupuesto balanceado y por qué no alcanzó tal objetivo. La Rama Judicial, la Rama Legislativa y la Oficina del Contralor informaron tener un presupuesto balanceado para el mismo periodo, al tomar medidas de austeridad en cumplimiento de su deber ministerial impuesto por el Art. VI, Sec. 7 de la Constitución de Puerto Rico, supra.

El Gobernador no ha colocado a este Tribunal en posición de determinar que, de concederse el remedio solicitado, intervendríamos en forma impermisible con su rol constitucional. Lo que está planteado en la controversia ante nos es si el Gobernador excedió las facultades que le otorga la Constitución de Puerto Rico, en un escenario como el presentado. ¿Tenía el Gobernador autoridad concedida por la Constitución de Puerto Rico o por la Legislatura para promulgar la OE-2006-10? ¿Tenía el Gobernador, como deber ministerial impuesto por la Constitución de Puerto Rico, la obligación de cumplir y de hacer cumplir la ley, que reconoce y establece la autonomía administrativa, funcional y fiscal de la Oficina del Contralor? ¿ Violó el Gobernador el principio de forma republicana de gobierno de la Constitución de Puerto Rico al promulgar la OE-2006-10? Definitivamente todos estos asuntos están sujetos a revisión judicial.

VI

Contralor de Puerto Rico

En Puerto Rico, el Contralor es un funcionario de rango constitucional. El Art. Ill, Sec. 22 de la Constitución de *402 Puerto Rico creó la posición de Contralor de Puerto Rico.(40) Dispone que el Contralor fiscalizará todos los ingresos, las cuentas y los desembolsos del Estado, de sus agencias e instrumentalidades y de los municipios, para determinar si se han hecho de acuerdo con la ley. Rendirá informes anuales y todos aquellos informes especiales que le sean requeridos por la Asamblea Legislativa y el Gobernador.(41)
El referido mandato constitucional se implantó mediante la Ley Núm. 9 de 24 de julio de 1952,(42) la cual creó la Oficina del Contralor, dirigido por el Contralor y bajo la responsabilidad de la Asamblea Legislativa.
La misión del Contralor consiste en realizar una intervención a posteriori (post audit) de las cuentas, los ingresos y los desembolsos del Gobierno para determinar su legalidad. Sus facultades están constitucionalmente circunscritas a investigar e informar sobre la legalidad del gasto dé fondos públicos en que ha incurrido cualquier entidad del Estado o sus agentes.(43) El poder investigativo del Contralor se extiende sobre las entidades privadas que contratan obras o servicios con el Estado.(44)
La Oficina del Contralor disfruta de autonomía administrativa, funcional y fiscal. El Art. VI, Sec. 11 de la Constitución de Puerto Rico dispone que el sueldo del Contralor se fijará mediante una ley especial y que no podrá ser disminuido durante el término para el cual fue nombrado.(45) El Art. 3(c) de la Ley de Contabilidad del Gobierno de Puerto Rico(46) establece que nada de lo dispuesto en dicho estatuto afectará la autonomía administrativa y fiscal de *403 la Oficina del Contralor de Puerto Rico. Dicho artículo, en su inciso (f), define a la Oficina del Contralor como una dependencia legislativa y prescribe que sus fondos deben estar, por ley, bajo la custodia y el control del Secretario.(47) El Art. 10(e) del referido estatuto dispone que la contabilidad central de la propiedad pública de la Oficina del Contralor la llevará el Secretario de Hacienda, rigiéndose por la reglamentación que a tales efectos establezca el Contralor.
Las transacciones financieras de las dependencias legislativas, aunque se tramitarán por conducto del Secretario, no estarán sujetas a la preintervención del Secretario en lo que se refiere a la exactitud, propiedad, corrección, necesidad y legalidad de las transacciones. La única responsabilidad del Secretario es cerciorarse de que la asignación o fondos contra el cual se ordena un desembolso tenga saldo suficiente para cubrirlo y que el comprobante que origine el desembolso esté firmado por un funcionario de la dependencia legislativa, debidamente autorizado.(48)
VII

Separación tripartita de poderes

El Art. I, Sec. 2 de la Constitución de Puerto Rico(49) dispone lo siguiente:

[Forma de gobierno]

El gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. (Énfasis suplido.)
*404 El Art. Ill, Sec. 1 de la Constitución de Puerto Rico(50) dispone lo siguiente:

[Asamblea Legislativa]

El Poder Legislativo se ejercerá por una Asamblea Legislativa, que se compondrá de dos Cámaras —el Senado y la Cámara de Representantes— cuyos miembros serán elegidos por votación directa en cada elección general. (Enfasis suplido.)
El Art. IV, Sec. 1 de la Constitución de Puerto Rico(51) dispone lo siguiente:

[Gobernador]

El Poder Ejecutivo se ejercerá por un Gobernador,, quien será elegido por voto directo en cada elección general. (Enfasis suplido.)
El Art. V, Sec. 1 de la Constitución de Puerto Rico(52) dispone lo siguiente:

[Poder judicial; Tribunal Supremo; otros tribunales]

El Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo,, y por aquellos otros tribunales que se establezcan por ley. (Enfasis suplido.)
La limitación del poder político constituye un principio desarrollado por la teoría política liberal. Su instrumento fundamental es la distribución del poder. La libertad es el resultado de la efectiva limitación del poder gubernamental sobre el individuo mediante un sistema donde “el poder frene al poder”. Por ello, es necesario distribuir el poder entre diversos organismos de gobierno que se sirven mutuamente de contrapesos, evitando de esa forma la concentración de poder gubernamental que pueda poner en peligro precisamente la libertad individual.(53) La organización interna de nuestro gobierno mediante la aprobación de nues *405 tra Constitución está estructurada sobre una división tripartita de los poderes gubernamentales, cuyo fin principal es, en síntesis, asegurar la libertad del individuo contra la opresión del Gobierno. El principio de la separación de poderes la adoptó nuestra Asamblea Constituyente para impedir que se ejercitara un poder arbitrario. No creemos que tuvo el propósito de evitar las fricciones, pero sí salvar al pueblo de la autocracia disponiendo la forma de resolver las controversias emergentes de la fricción inevitable e incidental a la distribución de los poderes gubernamentales entre las tres ramas de gobierno.
Las facultades delegadas por el pueblo al Gobierno, en virtud del principio de separación de poderes contenido en la Constitución de Puerto Rico, se distribuyen entre las tres ramas: la Judicial, la Ejecutiva y la Legislativa. Con este principio se persigue evitar la concentración de poderes en una sola rama de gobierno o el abuso de poder por parte de una de ellas, establecer un sistema de pesos y contra pesos que mantenga el equilibrio en el manejo del poder y asegurar una eficiente interacción entre las tres ramas gubernamentales.(54) El principio aludido no implica que las diferentes ramas del Gobierno deban mantenerse absolutamente separadas en todo momento ni que funcionen en “el vacío independientemente de las otras”.(55) Puede existir un grado de interrelación entre ellas, siempre y cuando se mantenga íntegra la autoridad de cada una. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Para ello, la relación entre los poderes del Gobierno debe ser dinámica y armoniosa.(56) Para decidir si *406 una actuación de la Rama Ejecutiva viola el principio de la separación de poderes, debe determinarse si la limitación de facultades que pretende concentra indebidamente el poder gubernamental en esa rama o si disminuye la independencia de alguna de ellas en el fiel desempeño de sus funciones. (57)

Poderes del Gobernador de Puerto Rico

El Art. IV, Sec. 4 de la Constitución de Puerto Rico(58) dispone lo siguiente:

[Facultades y deberes del Gobernador]

Los deberes, funciones y atribuciones del Gobernador serán: Cumplir y hacer cumplir las leyes.

Ejercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por esta Constitución o por ley.

(Enfasis suplido.)
El Gobernador de Puerto Rico tiene la facultad para ejercer la dirección general de la administración pública con el claro entendimiento de que comprende la “supervisión e inspección” de los departamentos y las agencias de gobierno de la Rama Ejecutiva, así como de las corporaciones públicas y de ciertas entidades autónomas creadas por ley.(59)
Una orden ejecutiva encuentra el apoyo legal en la facultad general del Primer Ejecutivo de cumplir y hacer cumplir las leyes, de vigilar y supervisar la conducta oficial de todos los funcionarios de la Rama Ejecutiva y de cuidar que se cumpla con los deberes y las obligaciones de sus cargos de acuerdo con la ley. Toda orden ejecutiva enmarca un mandato dirigido a los organismos gubernamentales de la Rama Ejecutiva, de acuerdo con la Constitución de Puerto Rico y el ordenamiento jurídico estatutario. No obs *407 tante, la facultad del Gobernador para emitir órdenes ejecutivas no puede ejercerse o tener un efecto contrario a lo dispuesto por ley. Las órdenes ejecutivas, promulgadas de acuerdo con la autoridad concedida al Gobernador, bien sea por la Constitución de Puerto Rico o por la Legislatura, tienen efecto de ley. Por el contrario, no tienen efecto de ley las Ordenes Ejecutivas promulgadas por el Gobernador en ausencia de autorización concedida por la Constitución de Puerto Rico o por estatuto.(60)
En la delimitación de los organismos gubernamentales de la Rama Ejecutiva, a los cuales va dirigida una orden ejecutiva, no debe acudirse a esta última como primer recurso cuando se quiera recabar la cooperación de criaturas jurídicas creadas por ley como las corporaciones públicas. Las corporaciones públicas generalmente ejercen sus poderes por conducto de una Junta de Directores, que es el organismo autorizado a decidir la acción que se ha de seguir en determinado asunto. Una orden ejecutiva promulgada por el Gobernador y dirigida a una corporación pública que la ley ha dispuesto su independencia y separación del resto de la Rama Ejecutiva, claramente conflije con la autonomía operacional y funcional con la que el estatuto que la creó le invistió para lograr sus fines. (61)
El Gobernador tiene la facultad y, a la vez, el deber y la obligación, de acuerdo con el Art. IV, Sec. 4 de la Constitución de Puerto Rico, supra, de cumplir y poner en vigor las leyes vigentes y de hacerlas cumplir y ponerlas en vigor a través de todos aquellos funcionarios que están bajo su poder de “supervisión e inspección”. Para el descargo de ese rol de naturaleza constitucional, el Gobernador tiene el poder absoluto e irrestricto sobre ciertos y determinados “funcionarios ejecutivos”, cuyas funciones son “puramente ejecutivas” y están directamente vinculadas con el descargo de su rol constitucional. De no tener facultades ple *408 narias sobre esos funcionarios, no podría formular la política pública de la Rama Ejecutiva, de acuerdo con el mandato democrático del Pueblo. Tales funcionarios son esencial y fundamentalmente los miembros del Gabinete del Gobernador y su cuerpo de asesores y ayudantes. A través de esos funcionarios se formula y se implanta la política pública de la Rama Ejecutiva y se inicia, cuando es necesario, la aprobación, mediante proyectos de ley de administración, de estatutos ajustados a su programa de gobierno. Una vez aprobada, y ya vigente esa legislación, los miembros del Gabinete fundamentalmente están llamados a cumplirla y ponerla en vigor en representación del Gobernador. No obstante, de mantenerse vigentes ciertos y determinados estatutos por no ser derogados o enmendados por la Legislatura, el Gobernador tiene la facultad y, a la vez, el deber y la obligación de cumplir con ellos y ponerlos en vigor, de hacerlos cumplir y que se pongan en vigor a través de los funcionarios que están bajo su “supervisión e inspección”. Existen funcionarios quienes, aunque están adscritos a la Rama Ejecutiva y bajo el poder de “supervisión e inspección” del Gobernador, las funciones que ejercitan no son esenciales ni fundamentales para que este último pueda rendir su rol constitucional. Sobre esos funcionarios el poder del Gobernador no es absoluto y puede ser restringido y limitado por la Asamblea Legislativa de Puerto Rico, sin menoscabar el poder de “supervisión e inspección” de naturaleza constitucional que el Primer Ejecutivo tiene sobre ellos. Existen algunas situaciones en las que el Poder Legislativo puede utilizar tal mecanismo para conceder a ciertos y determinados funcionarios adscritos a la Rama Ejecutiva la independencia y autonomía que son necesarias para que puedan descargar ciertas funciones sin interferencia y, por ende, en esos casos, de una forma más efectiva y eficiente. Ese es el caso, por ejemplo, de algunos funcionarios quienes, aunque están adscritos a la Rama Ejecutiva y bajo el poder de “supervisión e inspección” del Gobernador, descargan funciones que necesaria *409 mente tienen que ejercitarse en forma independiente. Sobre estos organismos que disfrutan de autonomía administrativa y funcional, el estatuto que los crea puede impedir válidamente que el Gobernador intervenga con sus fondos, asignados para sufragar sus gastos presupuestados mediante disposición legislativa.
Como mencionáramos previamente, la función de ser intérprete final de la Constitución de Puerto Rico le corresponde exclusivamente al Poder Judicial. La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente asignados a los tribunales.(62) Es función ineludible de los tribunales interpretar la Constitución y velar por que no se vulnere su espíritu y esquema democráticos. Cuando haya conflicto sobre el alcance de los poderes constitucionales de una rama de gobierno, los tribunales deben intervenir, con prudencia y deferencia, para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.(63)
Este caso obliga a impartir .vivencia a las disposiciones constitucionales y estatutarias que regulan la presente situación. La interrogante principal sobre la cual se centra la controversia es la siguiente: ¿tiene el Gobernador de Puerto Rico autoridad constitucional o estatutaria, activado el Art. VI, Sec. 6 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, para reducir unilateralmente los fondos disponibles, asignados por ley, para sufragar los gastos de la Oficina del Contralor de Puerto Rico? La contestación a esa interrogante es en la negativa.
*410 El 30 de junio de 2005 la Rama Legislativa aprobó la Resolución Conjunta de la Cámara de Representantes Núm. 445, 15ta Asamblea Legislativa, Ira Sesión Ordinaria, 17 de marzo de 2005, sobre el presupuesto del año fiscal 2005-2006. Ésta fue remitida al Gobernador, quien le impartió un veto de bolsillo. Tal acción activó el Art. VI, Sec. 6 de la Constitución de Puerto Rico, supra, y continuó vigente automáticamente para el año fiscal 2005-2006 la Resolución Conjunta de la Cámara de Representantes Núm. 927, aprobada por la Rama Legislativa el 30 de junio de 2004 para el año fiscal 2004-2005, que contiene las partidas de gastos del Gobierno para ese periodo. También quedaron vigentes para el año fiscal 2005-2006 otras medidas legislativas aprobadas para tener vigencia durante el año fiscal 2004-2005, que dispusieron sobre otras partidas para gastos de funcionamiento del gobierno.
El Gobernador tenía a su alcance impartirle un veto de partida a la Resolución Conjunta de la Cámara de Representantes Núm. 445 sobre el presupuesto del año fiscal 2005-2006. Dicha facultad del Gobernador comprendía la de eliminar una o más partidas o disminuir aquellas incluidas en dicha medida legislativa. (64) Tal acción hubiera producido el efecto de reducir los gastos proyectados para el año fiscal 2005-2006, antes de que la medida alcanzara fuerza de ley. No obstante, no lo hizo. Le impartió un veto de bolsillo a toda la medida, renunciando a esa facultad y activándose, de esa forma, el Art. VI, Sec. 6 de la Constitución de Puerto Rico, supra, continuando vigente el presupuesto dispuesto por ley para el año anterior. En el Diario de Sesiones de la Asamblea Constituyente quedó claro que la Asamblea Legislativa no tendría poder para revocar la utilización del veto de partidas por el Gobernador.(65) No obstante, si el Gobernador no utiliza tal facultad, y opta *411 por impartirle fuerza de ley con su firma o rechazarle con un veto de bolsillo, como lo hizo, le imprimió continuación a la medida legislativa que estaba vigente con relación al presupuesto del año fiscal 2004-2005. El Gobernador no tiene la facultad para enmendar una ley vigente mediante una orden ejecutiva. Por el contrario, tiene el deber y la obligación de cumplirla y hacerla cumplir.
La facultad constitucional del Gobernador de utilizar el veto de partidas le imprime un poder a ese funcionario, como medida de balance y equilibrio, durante el proceso de aprobación del presupuesto para el próximo año fiscal y antes de que alcance fuerza de ley con el propósito de cumplir con su obligación y deber constitucional de mantener un presupuesto balanceado. Una vez la medida alcanza fuerza de ley, el Gobernador queda sujeto y limitado, por el principio constitucional de separación de poderes, a tomar las medidas administrativas sobre la Rama Ejecutiva que dispone la Constitución de Puerto Rico y la ley. De otra forma, el principio de gobierno republicano que ofrece nuestro magno documento sería inoperante en un escenario como éste. Se acumularía todo el poder del Gobierno, en su función operacional, en el Primer Ejecutivo.
Una vez se convierte en ley una medida sobre presupuesto, las partidas formuladas para la Oficina del Contralor de Puerto Rico —dependencia adscrita a la Rama Legislativa— queda protegida, para su función constitucional, por el principio de igual rango de la separación de los tres poderes de gobierno. Esto es así para asegurar el funcionamiento efectivo y eficiente de nuestro sistema constitucional de gobierno republicano y democrático.
La Rama Ejecutiva estimó a principios del año fiscal 2005-2006 que las asignaciones totales de gastos ordinarios de funcionamiento del gobierno vigentes para ese periodo ascendieron a nueve mil doscientos ochenta y cuatro millones de dólares. El Secretario estimó que los recursos económicos totales que habrían de recaudarse para ese pe *412 riodo ascenderían a ocho mil novecientos cuarenta y cinco millones de dólares.(66) De acuerdo con tal escenario, la Rama Ejecutiva concluyó que el presupuesto de gastos del Gobierno para el año fiscal 2005-2006 habría de ser deficitario.
Ante eso, y según el Art. VI, Sec. 7 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, que prohíbe que las asignaciones y los gastos del Gobierno para un año fiscal excedan los recursos económicos totales calculados para ese mismo periodo, el Gobernador invocó el Art. VI, Sec. 6 del magno documento, supra, para emitir la Orden Ejecutiva 2006-10. Ésta autorizó los desembolsos que habrían de realizarse por el Departamento de Hacienda a las tres ramas del Gobierno y a la Oficina del Contralor de Puerto Rico, entre otros. El Art. VI Sec. 6, supra, dispone:
Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes (Énfasis suplido.)
En el “POR TANTO” tercero de la OE-2006-10, el Gobernador instruyó al Secretario de Hacienda a proceder con los desembolsos a la Oficina del Contralor en concepto de nómina, reduciendo a un setenta y cinco por ciento los desembolsos dispuestos para esa dependencia, por tal concepto, para mayo y junio del año fiscal 2005-2006, a pesar de que el Contralor anunció que su dependencia habría de concluir dicho periodo con un presupuesto balanceado, como consecuencia de las medidas y ajustes realizados, ante el escenario de que todas las dependencias del Go *413 bierno habrían de contar con menos recursos económicos que el gasto presupuestado.
El Contralor de Puerto Rico no es un funcionario que se encuentra bajo el poder de “supervisión e inspección” del Gobernador. No surge del Art. VI, Secs. 6, 7 y 8 de la Constitución de Puerto Rico, supra, ni del Art. 4(c) de la Ley de Gerencia y Presupuesto, supra, autoridad alguna del Gobernador para ajustar o tomar medidas con respecto a los desembolsos proyectados a la Oficina del Contralor, que se encuentra bajo la responsabilidad de la Asamblea Legislativa y es una entidad que disfruta de autonomía administrativa, funcional y fiscal. El Art. VI, Sec. 8 del Magno Documento, supra, y el referido estatuto formulan la norma sobre prioridades y las medidas administrativas que podrá tomar el Gobernador sobre la Rama Ejecutiva ante un cuadro de escasez de fondos públicos para sufragar el gasto presupuestado. Tal autoridad no se extiende a la Oficina del Contralor.
El Gobernador tiene la facultad para ejercer la dirección general de la administración pública y de “supervisar e inspeccionar” los departamentos y las agencias del gobierno de la Rama Ejecutiva, así como de las corporaciones públicas y de las entidades autónomas creadas por ley que están adscritas a la Rama Ejecutiva, y bajo ese poder del Gobernador. El Gobernador no tiene autoridad alguna sobre una entidad autónoma creada por la Constitución de Puerto Rico que no está adscrita a la Rama Ejecutiva, sino a la Rama Legislativa. El Secretario tiene la custodia y el control de los fondos del Gobierno para sufragar los gastos presupuestados. El Gobernador y su Secretario están obligados, por virtud del principio de separación de poderes de la Constitución de Puerto Rico y de los estatutos ya mencionados, a ordenar y a verificar los desembolsos autorizados por disposición legislativa para la Rama Legislativa y Judicial, y las entidades autónomas, para sufragar sus gastos. El Gobernador no tiene autoridad constitucional ni *414 estatutaria para realizar reducciones unilateralmente a los desembolsos proyectados por el Contralor para su oficina en concepto de nómina. La falta de consenso en el proceso político que se celebra en las Cámaras Legislativas, para afrontar la alegada crisis fiscal de Puerto Rico, no puede justificar que el Gobernador se abrogue un poder, cuyo ejercicio es claramente inconstitucional y cuyo único propósito es adjudicarle una ventaja indebida e impropia frente al Poder Legislativo en dicho proceso.(67)
Permitir tal proceder por parte del Gobernador disloca el fino balance de nuestra forma republicana de gobierno. La actuación del Gobernador violó el principio de la separación de poderes. Limitó las facultades de la Oficina del Contralor, concentrando de una forma indebida e impropia el control de todo el poder gubernamental en la Rama Ejecutiva. Tal actuación constituye una crasa violación y grave laceración a nuestro sistema republicano de gobierno. Con el pretexto de atender la alegada crisis presupuestaria, el Gobernador intervino con el funcionamiento de la Oficina del Contralor, llamada a fiscalizar los gastos de la Rama Ejecutiva. Estamos en la obligación de *415 salvar al pueblo de la autocracia ante el ejercicio de un poder arbitrario de tal magnitud por parte del Gobernador.
El Gobernador, como mencionáramos previamente, tiene un deber ministerial de cumplir y hacer cumplir las leyes. Dicho funcionario tiene, además, como deber ministerial impuesto por ley, que respetar el principio constitucional de separación de poderes y la autonomía administrativa, funcional y fiscal de la Oficina del Contralor. Está impedido de intervenir con los recursos económicos asignados por estatuto a la Oficina del Contralor, que es una dependencia legislativa autónoma, de origen constitucional. Cualquier ejercicio de esa dependencia, para balancear su presupuesto ante una situación de déficit, le corresponde al Contralor. La OE-2006-10 fue promulgada por el Gobernador, en ausencia de una autorización concedida a ese funcionario por el Art. VI, Sec. 6 de la Constitución de Puerto Rico, supra, con el propósito de intervenir con los fondos del Contralor, los cuales se encuentran bajo la custodia y el control del Secretario. Tal actuación constituye un incumplimiento con sus deberes ministeriales impuestos por la Constitución de Puerto Rico y las leyes. Tal orden ejecutiva no tiene efecto de ley alguno.
VIII
Estamos obligados a actuar frente al cuadro que tenemos presente para proteger y garantizar nuestra forma republicana de gobierno. Debemos intervenir con la actuación indebida e impropia del Gobernador sobre la autonomía funcional, administrativa y fiscal de la Oficina del Contralor. Nuestra intervención resulta imprescindible ante la crisis constitucional más seria y grave de nuestra historia. Es nuestro deber y obligación proteger y preservar el interés público inmanente del esquema democrático de la Constitución de Puerto Rico.
*416 Por los fundamentos antes expuestos, disentimos de lo actuado por la mayoría y expediríamos el auto de mandamus solicitado.

 Const. E.L.A., L.P.R.A., Tomo 1.

 Const. E.L.A., supra, ed. 1999, pág. 410.

 El 2 de mayo de 2006, el Contralor presentó una moción para anejar el juramento al recurso.

 El aquí suscribiente disintió sin opinión escrita. La Jueza Asociada Señora Rodríguez Rodríguez disintió con una opinión escrita.

 Véanse: Arts. 649 y 650 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sees. 3421 y 3422); Noriega v. Hernández Colón, 135 D.P.R. 406 (1994).

 Álvarez de Choudens v. Tribunal Superior, 103 D.P.R. 235 (1975).

 Partido Popular v. Junta de Elecciones, 62 D.P.R. 745, 749 (1944).

 Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 418 (1982).

 Dávila v. Superintendente de Elecciones, 82 D.P.R. 264 (1960).

 Cruz v. Administración, 164 D.P.R. 341 (2005).

 Asoc. de Periodistas v. González, 127 D.P.R. 704, 719 (1991).

 E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).

 C.E.E. v. Depto. de Estado, 134 D.P.R. 927 (1993); Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715 (1980).

 San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. 372 (2001); Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 D.P.R. 924 (2000); Pres. del Senado, 148 D.P.R. 737 (1999); P.P.D. v. Gobernador I, 139 D.P.R. 643 (Í995); Asoc. de Periodistas v. González, supra; Noriega v. Gobernador, 122 D.P.R. 650 (1988).

 32 L.P.R.A. Ap. III.

 Cruz v. Administración, supra; Asoc. de Periodistas v. González, supra.

 íd.

 Com. de la Mujer v. Srio. de Justicia, supra.

 Cruz v. Administración de Corrección, supra; Angueira v. J.L.B.P., 150 D.P.R. 10 (2000); El Vocero v. Junta de Planificación, 121 D.P.R. 115 (1988); Asoc. de Periodistas v. González, supra.

 City of Mesquite v. Aladdin’s Castle, Inc., 455 U.S. 283 (1982). Véase, además, Rullán v. Fas Alzamora, 166 D.P.R. 742 (2006).

 Gwaltney v. Chesapeake Bay Foundation Inc., 484 U.S. 49 (1987).

 Noriega v. Hernández Colón, supra, pág. 427; Hernández Agosto v. Romero Barceló, supra.

 Noriega v. Hernández Colón, supra; Hernández Torres v. Hernández Colón et al., 131 D.P.R. 593 (1992); Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992).

 Según el Contralor, existían dos posibles interpretaciones de la Orden Ejecutiva OE-2006-10 de 26 de abril de 2006 con respecto al pago de nómina. Primera, el pago completo de nómina durante las primeras tres quincenas de mayo y junio. Ante esa eventualidad, en o alrededor de 16 de junio de 2006 se produciría el cierre total de la Oficina del Contralor por no contar con la totalidad de los fondos disponibles. Segunda, pagando el 75% de la nómina quincenalmente hasta concluir el año fiscal, lo que, sostiene el Contralor, hubiera afectado en forma inmediata el bolsillo de todo el personal de su oficina.

 E.L.A. v. Aguayo, supra.

 íd„ pág. 597.

 P.P.D. v. Peña Clos I, 140 D.P.R. 779 (1996).

 Baker v. Carr, 369 U.S. 186, 210 (1962).

 Noriega v. Hernández Colón, supra, pág. 422.

 Silva v. Hernández Agosto, 118 D.P.R. 45 (1986); Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977); Powell v. McCormack, 395 U.S. 486 (1969).

 Baker v. Carr, supra, reafirmado en nuestra jurisdicción en Silva v. Hernández Agosto, supra.

 1 Rotunda and Nowak, Treatise on Constitutional Law: Substance and Procedure 3rd Sec. 2.16(a), págs. 311-312 (1999).

 C.E.S. U.P.R. v. Gobernador, 137 D.P.R. 83, 102 (1994); Noriega v. Hernández Colón, supra.

 Silva v. Hernández Agosto, supra; United States v. Nixon, 418 U.S. 683 (1974); Powell v. McCormack, supra; R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 697-698.

 L.H. Tribe, American Constitutional Law, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 98 y 106.

 Véase F.W. Seharpf, Judicial Review and The Political Question: A Functional Analysis, 75 Yale L.J. 517, 566-597 (1966); Noriega Rodríguez v. Jorobo, 136 D.P.R. 497 (1994).

 Noriega Rodríguez v. Jarabo, supra.

 Véase United States v. Nixon, supra.

 Ley Núm. 147 de 18 de junio de 1980 (23 L.RR.A. sec. 104(c)), según enmendada por la Ley Núm. 286 de 20 de diciembre de 2002.

 Const. E.L.A., supra, pág. 383.

 íd.

 2 L.P.R.A. sec. 71 et seq.

 RDT Const. Corp. v. Contralor I, 141 D.P.R. 424 (1996).

 íd.; H.M.C.A. (P.R.), Inc., etc. v. Contralor, 133 D.P.R. 945 (1993).

 Const. E.L.A. supra, pág. 416.

 Ley Núm. 230 de 23 de julio de 1974 (3 L.P.R.A. sec. 283b(c)), según enmendada por la Ley Núm. 140 de 11 de junio de 2004.

 3 L.P.R.A. sec. 283b(f).

 3 L.P.R.A. sec. 283e(d).

 Const. E.L.A., supra, pág. 256.

 íd, pág. 365.

 íd, pág. 384.

 íd, pág. 393.

 R. Serrano Geyls, op. cit., pág. 571.

 Sánchez et al. v. Srio. de Justicia et al., 157 D.P.R. 360 (2002); Pueblo v. Santiago Feliciano, 139 D.P.R. 361 (1995); Noriega v. Hernández Colón, supra; P.I.P. v. C.E.E., 120 D.P.R. 580, 611 (1988); Silva v. Hernández Agosto, supra.

 Pueblo v. Santiago Feliciano, supra, pág. 420. Véase Noriega v. Hernández Colón, supra.

 Pueblo v. Santiago Feliciano, supra, pág. 420; Silva v. Hernández Agosto, supra, pág. 57.

 Pueblo v. Santiago Feliciano, supra.

 Const. E.L.A., supra, pág. 385.

 4 Diario de Sesiones de la Convención Constituyente 2606 (1951).

 Op. Sec. Just. Núm. 1985-5 de 27 de febrero de 1985.

 íd., págs. 31-32.

 Santa Aponte v. Srio. del Senado, supra, pág. 759; Bond v. Floyd, 385 U.S. 116, 131 (1966).

 Silva v. Hernández Agosto, supra, pág. 57; Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716, 731-734 (1982); Santa Aponte v. Srio. del Senado, supra; García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976); Fuster v. Busó, 102 D.P.R. 327 (1974).

 Art. Ill, Sec. 20, Const. E.L.A., supra, pág. 382.

 J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, Vol. Ill, págs. 162-163.

 El Secretario de Hacienda formuló tal cifra como un estimado, no como un dato concreto.

 El Art. 267 del Código Penal de Puerto Rico, 33 L.P.R.A. see. 4895, tipifica como delito las conductas siguientes:

“Malversación de fondos públicos

“Incurrirá en delito grave de tercer grado, independientemente de si obtuvo o no beneficio para sí o para un tercero todo funcionario o empleado público que sea directa o indirectamente responsable de la administración, traspaso, cuidado, custodia, ingresos, desembolsos o contabilidad de fondos públicos que:

“(a) Se los apropie ilegalmente, en todo o en parte;
“(b) los utilice para cualquier fin que no esté autorizado o que sea contrario a la ley o ala reglamentación',
“(c) los deposite ilegalmente o altere o realice cualquier asiento o registro en alguna cuenta o documento relacionado con ellos sin autorización o contrario a la ley o a la reglamentación;
“(d) los retenga, convierta, traspase o entregue ilegalmente, sin autorización o contrario a la ley o ala reglamentación; o
“(e) deje de guardar o desembolsar fondos públicos en la forma prescrita por ley.

“Cuando el autor sea un funcionario público o la pérdida de fondos públicos sobrepase de cincuenta mil (SO,000) dólares, incurrirá en delito grave de segundo grado.

“El tribunal podrá también imponer la pena de restitución.” (Enfasis suplido.)